## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DAWN M. ZITZKA and JAMES ZITZKA )
individually and on behalf of JANE DOE 1 )
and JANE DOE 2, their minor daughters, and )
JOHN DOE, their minor son, )
                                 )    No. 07 C 0949
              Plaintiffs, )    Magistrate Judge Schenkier
                                 )
vs. )
                                 )
THE VILLAGE OF WESTMONT, a municipal )
corporation; POLICE OFFICERS JAMES )
SCHLICHER, MICHAEL DALE, DAVID )
NEWTON, GREGORY COMPTON, TERRENCE )
BOYER and JOHN BRIGHT, )
                                 )
              Defendants. )

## MEMORANDUM OPINION AND ORDER[1]

      Allegations of an underage drinking party and the rape of a minor in Westmont, Illinois,

evolved into this lawsuit after the alleged victim's parents expressed their discontent with the

Westmont Police Department ("WPD") investigation in a variety of ways, and were eventually

arrested on various charges. Plaintiffs – Jane Doe 1 ("Miss Zitzka," the minor who was the alleged

victim of a rape), her parents (Mr. and Mrs. Zitzka), and Miss Zitzka's two younger siblings – filed

this suit on February 20, 2007, against the Village of Westmont ("Westmont" or "the Village") and

six Westmont police officers in their individual and official capacities. In an earlier opinion, the

Court dismissed Counts II-III, V-VI, and VIII of the first amended complaint ("the Complaint").

*Zitzka v. Vill. of Westmont*, No. 07 C 0949, 2007 WL 3334336 (N.D. Ill. Nov. 6, 2007). In the

---

[1]On August 30, 2007, by consent of the parties and pursuant to 28 U.S.C. § 636(c), the case was reassigned to
this Court for all proceedings, including the entry of final judgment (docs. ## 42-43).

remaining claims, plaintiffs sue defendants under 42 U.S.C. § 1983 for retaliation and unlawful arrest in violation of the First and Fourth Amendments (Counts I and IV), as well as for intentional infliction of emotional distress and malicious prosecution in violation of state law (Counts VII and IX).

Defendants have filed five individual motions for summary judgment, with one joint memorandum and reply brief in support of the motions (doc. # 123). The individual motions were filed by: (1) the Village (doc. # 122); (2) Westmont Police Detective Michael Dale ("Detective Dale") (doc. # 121); (3) Westmont Police Officers Terrence Boyer ("Officer Boyer") and Gregory Compton ("Officer Compton") (doc. # 119); (4) Westmont Police Officers John Bright ("Sergeant Bright") and David Newton ("Officer Newton") (doc. # 120); and (5) Westmont Police Detective James Schlicher ("Detective Schlicher") (doc. # 117). Defendants also have filed three motions to strike various materials plaintiffs have filed in opposing the summary judgment motions (docs. ## 142-144).

For the reasons set forth below, the Court: (1) denies the motions to strike (docs. ## 142-144); (2) grants the Village's motion for summary judgment (doc. # 122); and (3) grants in part and denies in part the remaining motions for summary judgment (docs. ## 117, 119-21).

**I.**

As a preliminary matter, we address the three motions to strike filed by defendants.

**A.**

We consider together defendants' joint motion to strike, in whole or in part, plaintiffs' response to defendants' joint Local Rule ("L.R.") 56.1(a) statement of facts (doc. # 143), and their joint motion to strike plaintiffs' L.R. 56.1(b)(3)(C) statement of additional facts (doc. # 144).

2

Defendants argue that plaintiffs' responses and additional facts should be stricken because they do not comply with L.R. 56.1 and this Court's Case Management Procedures, contain improper legal argument, and are not supported by proper citations to the record (Defs.' Mot. to Strike Resp. at 2; Defs.' Mot. to Strike Add'l Facts at 2). In addition, defendants contend that plaintiffs' responses to defendants' statement of facts are non-responsive (*Id.*)

In this district, L.R. 56.1 provides the framework through which parties lay out the material facts that support or oppose summary judgment. The trial court deems the properly supported material facts set forth in the parties' statements to be admitted unless they are properly controverted by the statement of an opposing party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006); L.R. 56.1(a)(3); L.R. 56.1(b)(3)(c). Although we are entitled to demand strict compliance with the Local Rules, whether to do so is entrusted to trial court's discretion. *Amnions v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

In a recent case in this district, the court considered a motion to strike portions of the defendants' statement of facts and the affidavits they relied on, based on similar reasons alleged by defendants in this case: they were not supported by admissible record evidence, lacked foundation, contradicted prior deposition testimony, or were conclusory. *Alvarado v. Corporate Cleaning Serv., Inc.*, No. 07-CV-6361, 2010 WL 2523432, at *1 n.2 (N.D. Ill. June 21, 2010). While the court agreed with the plaintiffs that a number of the defendants' factual statements lacked proper evidentiary support or otherwise violated L.R. 56.1, the court chose to disregard the improper factual assertions rather than strike them and denied the plaintiffs' motion to strike as moot. *Id.*; *see also Malec v. Sandford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000) (where assertions advanced as material

3

fact are not supported by admissible record evidence, the court has discretion to disregard the alleged facts).

Similarly, in the instant case, many of defendants' criticisms are well-taken. However, like the court in *Alvarado*, we are able to separate plaintiffs' properly alleged facts from the improperly asserted characterizations of or conclusions drawn from those facts. Furthermore, although the Court will not consider additional facts improperly alleged in plaintiffs' response to defendants' statement of facts, many of these facts are properly asserted elsewhere in plaintiffs' submissions. Therefore, we deny as moot defendants' joint motion to strike plaintiffs' response to defendants' statement of facts (doc. # 143), and defendants' joint motion to strike plaintiffs' statement of additional facts (doc. # 144).

**B.**

Defendants also have filed a joint motion to strike plaintiffs' exhibits 1 through 7 (doc. # 142): (1) Mrs. Zitzka's declaration; (2) Mr. Zitzka's declaration; (3) Miss Zitzka's declaration; (4) the declaration of the Zitzkas' son, John Doe; (5) the declaration of the Zitzkas' youngest daughter, Jane Doe 2; (6) the declaration of Robert Pekich, Mrs. Zitzka's father; and (7) the declaration of John Quinn, the attorney who represented Mrs. Zitzka in three prosecutions brought against her based on arrests by the WPD. Defendants contend that these declarations violate Federal Rule of Civil Procedure 56(e), which provides that an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). Defendants argue that various paragraphs from each of the above declarations should be stricken because they contradict or are inconsistent with the affiant's prior deposition testimony, raise improper legal argument, are conclusory or vague, contain

4

inadmissible hearsay, fail to establish a proper foundation, or are not based on the affiant's personal knowledge.

As with defendants' first two motions to strike, we find this motion unnecessary. The Court can separate improper legal argument and vague or conclusory statements on the one hand, from properly asserted statements of fact on the other. In addition, we will not consider inadmissible hearsay statements whose substance would not be admissible at trial, *see Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010), nor "self-serving statements" that are without factual support in the record. *Evans v. City of Chicago*, 434 F.3d 916, 933 (7th Cir. 2006); *see also Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

Likewise, the Court will assess whether statements in the affidavits contradict the affiant's prior deposition testimony or are not based on the affiant's personal knowledge. "As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1055 (7th Cir. 2000) (internal quotations omitted). When a declarant contradicts his or her prior deposition testimony, a court must examine the particular circumstances of the change in testimony to determine "whether it is plainly incredible or merely creates a credibility issue for the jury." *Patton v. MFS/Sun Life Fin. Distribs.*, 480 F.3d 478, 488 (7th Cir. 2007). That said, these principles do not require that a court jettison an entire affidavit because some portions of it contradict sworn testimony. Rather than strike the declarations and risk striking some consistent statements, we will review each statement in the affidavits separately and determine on a case by

5

case basis whether the statement contradicts prior testimony; is based on personal knowledge; and is material to the motions. Thus, we deny as moot defendants' motion to strike plaintiffs' exhibits 1 through 7 (doc. # 142).

## II.

We now proceed to the well-established legal standards governing summary judgment motions. Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To withstand a motion for summary judgment, the non-moving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case. *Id.* The Court will construe the evidence and all reasonable inferences in favor of the non-moving party. *Durable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 501 (7th Cir. 2009). When a material fact or set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 741-42 (N.D. Ill. 2005).

In light of these summary judgment standards and the rulings on defendants' motions to strike, we turn to the material facts that are relevant to the motions for summary judgment, as taken

6

from defendants' joint statement of material facts ("DSOF") (doc. # 124) and plaintiffs' statement of additional facts ("PAF") (doc. # 135). The facts set forth below are undisputed unless otherwise noted by the Court.[2] "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg*, 604 F.3d at 466.

## A.

On September 25, 2004, Miss Zitzka attended a party at the Westmont home of a classmate, JA (DSOF ¶ 8).[3] Miss Zitzka, who was thirteen years old at the time, came home from the party drunk, stumbling, incoherent, and with vomit on her clothing (PAF ¶ 2). Mrs. Zitzka called the WPD to report that an underage drinking party was taking place at JA's home (PAF ¶ 3; DSOF ¶ 8). Officers Borgardt and Gunther (who are not parties in this case) reported to the scene and spoke with Mrs. Zitzka outside JA's home (DSOF ¶ 9). Mrs. A, who is JA's mother, denied serving alcohol to the minors (*Id.*). Two of the minors remaining at the party had reportable blood alcohol levels (DSOF ¶ 10). The police arrested them and one other minor (PAF ¶ 3). Other minors later admitted that they had been drinking at the party (*Id.*). Mrs. A was not charged or arrested in the matter (DSOF ¶ 11).

On September 26, 2004, Mrs. Zitzka and her daughter went to the police station so Miss Zitzka could write a statement about the party (DSOF ¶ 12). The investigation was referred to

---

[2]In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute, that reflects our determination that the evidence does not show that the fact is in genuine dispute.

[3]Although many of the exhibits in this case refer to the full names of participants and witnesses to the events set forth in these facts, defendants and plaintiffs refer to them using only their initials. In the interest of consistency, we will also use initials when referring to these individuals.

7

Detective Schlicher on October 2, 2004 (DSOF ¶ 14). He was out of town at the time and did not begin his investigation until October 19, 2004 (DSOF ¶ 15). Detective Schlicher had known Mrs. A and her son for years (PAF ¶ 4).

In October 2004, Miss Zitzka began receiving harassing and threatening internet messages from students at her school (PAF ¶ 23). Mrs. Zitzka printed some of the messages and provided them to the WPD (*Id.*). Detective Schlicher was assigned to investigate this as well, but he did not read any of the messages (*Id.*). On November 18, 2004, Mrs. Zitzka spoke with Lieutenant Sandford about the messages (PAF ¶ 25).

On October 21, 2004, Detective Schlicher went to Miss Zitzka's school and took her into a private room to discuss the alleged underage drinking party and the harassment she had received since then from classmates (PAF ¶ 5). Miss Zitzka had been called a "slut" by her classmates, and Detective Schlicher asked her why she thinks her classmates called her that name (*Id.*). Miss Zitzka began crying and told Detective Schlicher that she had been raped by her former boyfriend's older brother, MO, on December 31, 2003 (PAF ¶ 6; Defs.' Ex. V). That evening, Miss Zitzka told her mother about the alleged rape and her meeting with Detective Schlicher (PAF ¶ 7). Mrs. Zitzka went to the police station to demand an investigation and the arrest of MO (*Id.*). The desk officer called Detective Schlicher and told him that Mrs. Zitzka was at the police station, but Mrs. Zitzka did not meet with Detective Schlicher that night (*Id.*). The next day, October 22, 2004, Mrs. Zitzka met with Detective Schlicher to demand an investigation into the alleged rape (PAF ¶ 8).

On October 26, 2004, Detective Schlicher met with Miss Zitzka and the female students who had been bullying her since JA's party (PAF ¶ 9). The students were angry with Miss Zitzka, who felt intimidated at the meeting (*Id.*; Defs.' Ex. V). Detective Schlicher doubted Miss Zitzka's

8

credibility and did not believe that Mrs. A served alcohol at the party (PAF ¶ 8; Defs.' Ex. V). On November 2, 2004, Detective Schlicher closed the investigation into the alleged underage drinking party at Mrs. A's house based on the testimony of Mrs. A and other minors who were at Mrs. A's home that night (DSOF ¶ 22).

On October 27, 2004, Mrs. Zitzka returned to the police station to discuss the rape investigation (PAF ¶ 10). Detective Schlicher and Lieutenant Sandford doubted her daughter's credibility (*Id.*). On November 3, 2004, Detective Schlicher interviewed the accused rapist, MO, for the first time (PAF ¶ 11). MO's mother and step-father were present during the questioning (DSOF ¶ 24). MO denied raping Miss Zitzka, maintaining that he was with his girlfriend the night of the alleged rape (PAF ¶ 11; DSOF ¶ 25). Detective Schlicher never called or contacted the girlfriend (PAF ¶ 11). He closed the investigation into the alleged rape that day without filing charges (DSOF ¶ 27; Defs.' Ex. W at 5-6).

## B.

Mr. and Mrs. Zitzka expressed their dissatisfaction with the WPD's investigation in several ways. *First*, in late October 2004, Mrs. Zitzka placed a sign on the Zitzka family automobile which read: "The Westmont Police Do Not Serve or Protect" (PAF ¶ 12). The sign remained on the family automobile through April 2005 (DSOF ¶ 33). Mr. Zitzka also displayed a sign on his truck which read: "The Westmont Police Do Not Serve or Protect. Why Are We Paying Their Salaries?" (PAF ¶ 12). The sign remained on the truck until early November 2004 (PAF ¶ 13). Officer Compton learned about the signs from the WPD's morning roll call, where the signs were being discussed among the police officers (PAF ¶ 20). Officer Boyer had never heard of the Zitzkas before he saw the sign on the car in the Zitzkas' driveway (PAF ¶ 21). Detective Dale and Sergeant Bright were

9

aware that signs on the Zitzkas' vehicles said something derogatory about the WPD, but they denied seeing the signs themselves (DSOF ¶¶ 37-38). Sergeant Bright was offended by the signs, and he discussed them with other officers (PAF ¶ 18). Detective Dale talked about the signs with his fellow detectives, including Detective Schlicher (PAF ¶ 19). Detective Schlicher saw the sign on the car when it was parked in front of the junior high school (DSOF ¶ 41). Only one defendant, Officer Newton, claimed not to have been aware of the signs on the Zitzkas' vehicles until they filed this lawsuit (DSOF ¶ 36); however, in a handwritten message dated June 16, 2005, Lieutenant Sandford asked Officer Newton to note if Mrs. Zitzka's vehicle had any new messages on its window (Resp. to DSOF ¶ 36; Pls.' Ex. 9).

*Second*, after the underage drinking and rape cases were closed, Mrs. Zitzka contacted the DuPage County State's Attorney's office to demand further investigation (DSOF ¶ 28). On March 3, 2005, Assistant State's Attorney ("ASA") Joe Ruggiero notified her that charges against Mrs. A were denied (DSOF ¶ 29). The Children's Center unit of the State's Attorney's office independently investigated the rape claim made by Miss Zitzka against MO, and on or about June 20, 2005, the State's Attorney's office determined that there was insufficient evidence to file charges against MO (DSOF ¶¶ 30-31).

*Third*, on April 28, 2005, Mrs. Zitzka made a speech before the Village of Westmont Committee of the Whole,[4] which was broadcast on television (PAF ¶ 14). The speech criticized the WPD and Detective Schlicher's handling of the investigation into the alleged rape of Miss Zitzka (DSOF ¶ 34). The speech was played repeatedly on the television at the Westmont police station

---

[4]The Westmont Committee of the Whole meets bi-monthly, and provides a forum for Village residents to raise and comment to the Village board on issues of concern to themselves and the Village.

(PAF ¶ 14). Detective Dale and Sergeant Bright testified that they were not aware of Mrs. Zitzka's speech until the instant case was filed (DSOF ¶¶ 37, 38). Detective Schlicher stated that he watched part of Mrs. Zitzka's speech in the police department lunchroom (PAF ¶ 22).

## C.

During the period from September 25, 2004 – the date of the alleged underage drinking party – through June 2005, the Zitzka family had several more encounters with the WPD.

### 1.

Sometime after Mr. and Mrs. Zitzka displayed the signs on their vehicles, the WPD ordered extra watches to be assigned to Zitzkas' home, meaning that officers would make an extra pass by the Zitzka home during a shift or sit in their car and watch the area for a while (PAF ¶ 27). As shift supervisor, Sergeant Bright ordered most of the extra watches (*Id.*). Detective Dale estimated that he sat in his unmarked squad car near the Zitzka house on five or six occasions (DSOF ¶ 148). Detective Schlicher sat near the Zitzka house in his unmarked squad car on two occasions when he attempted to serve Mrs. Zitzka with arrest warrants in June 2005, and he occasionally drove past the Zitzka house in the normal course of his police duties (DSOF ¶ 150).

### 2.

On March 10, 2005, Officers Boyer and Compton went to the Zitzka residence in two separate patrol cars pursuant to Lieutenant Sandford's orders (PAF ¶ 30; DSOF ¶ 44), and threatened Mrs. Zitzka with arrest if she did not stop calling the State's Attorney's office (PAF ¶ 31). The parties dispute whether the officers went to the Zitzka home at the request of the State's Attorney's office or on their own accord (DSOF ¶ 42; Pls.' Resp. to DSOF ¶ 42). When the officers entered the home, Mrs. Zitzka's two younger children were sitting on the couch watching television near the

11

police officers (PAF ¶ 31). The parties dispute whether Mrs. Zitzka invited the officers into the home or whether the officers opened the screen door and walked in without an invitation (DSOF ¶ 45; Pls.' Resp. to DSOF ¶ 45). Mrs. Zitzka testified that the officers were in her home five to ten minutes, while the officers believe they were there one to two minutes (DSOF ¶ 48). The Chief of the WPD, Randall Sticha, ultimately apologized to Mrs. Zitzka because ASA Ruggiero later informed the WPD that Mrs. Zitzka was not the person calling their office (DSOF ¶ 52). Rather, Angela Goetschel – with whom Mrs. Zitzka worked at the time – had been calling the State's Attorney's office about twenty times per day (DSOF ¶ 53).

### 3.

In April and May of 2005, the WPD responded to several alleged incidents between MO's family and the Zitzka family (DSOF ¶¶ 56-59). On April 19, 2005, MO's mother, Mrs. O, reported to the WPD that Mrs. Zitzka had been driving by her house making obscene gestures and yelling obscenities (DSOF ¶¶ 58-60). Mrs. O also reported that Mrs. Zitzka made a harassing telephone call to her house on April 19, 2005 (PAF ¶ 38). That day, April 19, 2005, Lieutenant Sandford and Chief Sticha exchanged emails discussing Mrs. O's complaints (PAF ¶ 33; Defs.' Ex. CB). Lieutenant Sandford wrote that "the only thing that will stop her [Mrs. Zitzka] is to get arrested several times" (DSOF ¶ 65). Lieutenant Sandford assigned Detective Schlicher to investigate the call (PAF ¶ 38). On April 21, 2005, Mrs. O's husband, Mr. O, reported to the WPD that Mrs. Zitzka drove past his house, stuck up her middle finger, and yelled rapist and faggot (DSOF ¶ 66). Also, on May 16, 2005, Mrs. O reported that Mrs. Zitzka tailgated her while she was driving (DSOF ¶ 67). These complaints did not result in criminal charges against Mrs. Zitzka.

12

On June 13, 2005, AT&T notified Detective Schlicher that its trace of the April 19, 2005, phone call indicated that it came from the phone of a teenaged girl unrelated to the Zitzkas (PAF ¶ 39). On June 15, 2005, Detective Schlicher prepared a complaint charging Mrs. Zitzka with harassment by electronic communication, and obtained a warrant for her arrest (PAF ¶ 40; DSOF ¶ 86).

On May 30, 2005, Officer Sean Lawrence (who is not a party in this case) was dispatched to the O's home when Mr. O crashed his vehicle into a utility pole following a confrontation with Mrs. Zitzka outside his residence (PAF ¶ 41; DSOF ¶¶ 69-72). There were two reports filed in connection with the incident: an incident report for disorderly conduct, naming Mrs. Zitzka as the suspect and MO as the victim (Pls.' Ex. 19 at 1), and a crash report (Pls.' Ex. 20). In the incident report, Officer Lawrence reported that Mr. O related that Mrs. Zitzka was harassing MO and shouting at him (Pls.' Ex. 19 at 4). MO's younger brother reported seeing Mrs. Zitzka standing on the sidewalk in front of his house (*Id.*). Mrs. Zitzka related to Officer Lawrence that she was driving in front of Mr. O's house when she saw MO running down his driveway toward her car and then Mr. O's vehicle pulled in front of her car (*Id.*). Mrs. Zitzka related that she then put her vehicle in reverse, and Mr. O's vehicle pursued her vehicle in reverse, at which point he lost control of his vehicle and struck a utility pole (*Id.*). Mrs. Zitzka contends that she never entered the O's property (PAF ¶ 41). Officer Lawrence noted that "[d]ue to the related, ongoing problems between the mentioned parties . . . [he] would pass on all information concerning this incident on to Detective Schlicher . . ." (*Id.*; DSOF ¶ 74). Officer Jeff Borgardt filled out the crash report on May 30, 2005. He wrote that Mr. O was in a vehicle "chasing a red vehicle containing both Zitzkas [Mrs. Zitzka

13

and Miss Zitzka]," and while Mr. O's vehicle was in reverse, he "lost control & spun & hit a utility pole" (Pls.' Ex. 20 at 2). Mr. O received a citation (*Id.*).

Detective Schlicher wrote up a second incident report for the May 30, 2005, event on June 30, 2005 (Pls.' Ex. 21). In the report, he indicated that the O family complained that Mrs. Zitzka had been harassing their family for several months, including driving down their street and swearing out her vehicle window at them and their son MO (*Id.* at 1). Detective Schlicher wrote that MO reported that on May 30, 2005, Mrs. Zitzka was on the O's property inside of the sidewalk taking pictures and calling MO names (*Id.*). The June 30 report indicated that the O's signed a complaint against Mrs. Zitzka, and that on June 15, 2005, Detective Schlicher obtained an arrest warrant for Mrs. Zitzka for criminal trespass to land (*Id.;* PAF ¶ 43; DSOF ¶ 85).

**4.**

On May 27, 2005, several students from Westmont Junior High and Westmont High School met at a park near the Zitzka home to carry out a plan to throw eggs at the Zitzka home (DSOF ¶ 92). That night one of the students, HH, wrote the word "SLUT" in black spray paint on the sidewalk in front of the Zitzka home (*Id.*). Officer Nicholas Glynn (who is not a party in this case) arrived at the scene in response to a report of a female yelling for help (DSOF ¶ 93). Mr. Zitzka, who was bleeding from his face, informed Officer Glynn that after hearing noises, he went outside and discovered vandals outside his home (PAF ¶ 49; DSOF ¶ 94). Although most of the students ran off, Mr. Zitzka caught one of the girls (AMM) and a boy (PK), who tried to get Mr. Zitzka to release AMM (DSOF ¶ 95). Mr. Zitzka alleged that PK struck him in the face (*Id.*), and then Mr. Zitzka grabbed AMM and PK by the neck of their hoodies and began walking them back towards his house to call police (DSOF ¶ 96). AMM got away and ran into a neighboring house (DSOF ¶ 97). Officer

14

Glynn located AMM at Brett Laduzinski's house (DSOF ¶ 99). AMM told Officer Glynn that Mr. Zitzka swung at PK but missed and hit her in the nose, but Mr. Zitzka contends that PK struck AMM when he swung at but missed hitting Mr. Zitzka (DSOF ¶ 99; Pls.' Resp. to DSOF ¶ 99). After taking AMM's report, Officer Glynn arrested her, charging her as a juvenile with disorderly conduct (DSOF ¶ 99). Officer Borgardt was also at the Zitzka house the night of May 27, and he observed the word "SLUT" spray painted on the sidewalk (DSOF ¶ 115)

On May 28, 2005, Officer Glynn interviewed HH, AMM, and another minor who was at the scene the previous evening, AS (DSOF ¶ 100). HH admitted throwing eggs at the Zitzka home and spray painting the word "SLUT" on the sidewalk in front of their house, covering two sidewalk squares (*Id.*). HH was charged as a minor with criminal damage to village property (*Id.*). On May 29, 2005, Officer Glynn interviewed PK regarding the incident and charged him as a minor with disorderly conduct and battery to Mr. Zitzka (DSOF ¶ 101).

On May 31, 2005, Chief Sticha met with Lieutenant Sandford, Detective Schlicher, and Deputy Chiefs of Police Tom Mulhearn and Randy King (PAF ¶ 34). Chief Sticha's brief handwritten notes from the meeting state, in their entirety: "(Zitzka Caper) -Rick, Tom, Jim, Randy & Me- Ostranders [,] daughter Angel [,] Marmolejo [,] Hackney [,] Moats [,] Seedman [,] Klemz" (Pls.' Ex. 8). In his deposition, Chief Sticha stated that the purpose of the meeting was to discuss "the ongoing Zitzka case" (Pls.' Ex. 15: Sticha Dep. at 110, 114).

Also on May 31, 2005, Lieutenant Sandford assigned Detective Dale to investigate the May 27, 2005 incident (PAF ¶ 51). Detective Dale spoke with Mr. Zitzka and AMM about the incident (DSOF ¶¶ 103-04). AMM admitted throwing eggs at the Zitzka house, and she stated that Mr. Zitzka choked her by grabbing her hoodie, but she was able to run to a neighbor's home when PK

15

hit Mr. Zitzka (DSOF ¶ 104). Detective Dale observed a bruise on the inside of AMM's upper lip and marks on her neck (*Id.*).

Detective Dale next interviewed the Zitzkas' neighbors. On June 1, 2005, he interviewed Mr. Laduzinski (DSOF ¶ 105). Mr. Laduzinski reported that on May 27, 2005, he heard a young woman screaming "Help me! Help me! He's coming after me!" (*Id.*). Mr. Laduzinski then ran to his door to let AMM in, and he saw that she was bleeding "profusely" from the nose and mouth (*Id.*). Mr. Laduzinski showed Detective Dale a drop of AMM's blood on his floor (*Id.*). Detective Dale also interviewed Zitzka neighbor Karen Majewski. She told Detective Dale that on May 27, 2005, she heard a man screaming "Why are you always fucking with my daughter!" and a young girl scream "Help me! Oh my God help me! Please help me!" (DSOF ¶ 110). On June 2, 2005, Detective Dale interviewed neighbor Thomas Maicke (DSOF ¶ 111). Mr. Maicke said that on May 27, 2005, he heard a man yelling at some kids, and when he looked outside, he saw a man dragging two kids by the neck, yelling "You're fucking with my daughter all the time," and "I should kick your asses" (*Id.*). Mr. Maicke reported that he saw the man throw the boy to the ground and pull back his arm to hit the boy, but he did not see if the hit occurred because he went to call the police (*Id.*). Detective Dale noted a "galvanizing of the neighborhood against the Zitzkas" (PAF ¶ 52).

Detective Dale interviewed PK on June 2, 2005 (DSOF ¶ 112). PK admitted throwing eggs at the Zitzka house on May 27, 2005 (*Id.*). PK stated that Mr. Zitzka grabbed AMM and screamed "You guys are dead! I'm going to kill you" (*Id.*). PK said that when he tried to help AMM, Mr. Zitzka grabbed his collar, pressing his right thumb in the side of his neck (*Id.*). PK reported that he asked Mr. Zitzka to ease his grip, but Mr. Zitzka pushed harder, threw him to the ground, and swung at him, missing and hitting AMM instead (*Id.*). Mr. Zitzka then grabbed PK by his hoodie but PK

16

was able to wriggle out and hit Mr. Zitzka in the face once or twice (*Id.*). PK denied hitting AMM (*Id.*).

On June 9, 2005, Detective Dale interviewed AS, who was part of the group of minors in front of the Zitzka house on May 27, 2005 (DSOF ¶ 116). She reported hearing Mr. Zitzka scream, "Come back, I'm gonna kill you all," and she saw him grab AMM (*Id.*).

Detective Dale interviewed Mr. Zitzka on June 10, 2005. Mr. Zitzka provided a written statement detailing his version of the May 27, 2005 events, which was typed up by Mrs. Zitzka (DSOF ¶ 118). During the meeting, Detective Dale saw that Mr. Zitzka had a tape recorder in his shirt pocket, and Lieutenant Sandford ordered Mr. Zitzka to give him the tape recorder, which Mr. Zitzka did (PAF ¶ 69). The WPD kept the tape recorder as evidence of a possible crime (PAF ¶ 70; Ex. P: Sandford Dep. at 134-43).

On June 10, 2005, AS, AMM, and HH received station adjustments for the charges against them (DSOF ¶ 119).[5] On the same day, AMM's and PK's mothers signed criminal complaints against Mr. Zitzka for battery arising from the May 27, 2005 incident (DSOF ¶ 117), and the court issued an arrest warrant for Mr. Zitzka on the charge of criminal battery (DSOF ¶ 120).

### 5.

The night that the word "SLUT"was painted in black on the sidewalk in front of their home, Mr. Zitzka tried to power wash the spray paint off the sidewalk (PAF ¶ 55). When that failed,

---

[5] Juvenile police officers in Illinois have the authority to resolve juvenile cases by issuing station adjustments. Station adjustments allow officers to intervene and redirect delinquent minors, while still ensuring that minors are held accountable for their actions. When juvenile police officers issue a station adjustment, they arrest the minor, handle the case at the police station, and then release the minor without referring the case to court. Station adjustments are typically issued for less serious offenses. *See* "Police use of formal and informal station adjustments for juveniles in Illinois," *On Good Authority*, Illinois Criminal Justice Information Authority, Nov. 2002, http://www.icjia.state.il.us/public/pdf/oga/station%20adjust.pdf (accessed September 1, 2010).

between May 28 and May 30, 2005, Mrs. Zitzka painted a base coat of white or gray paint over the insult, and then painted "♥ Jesus" in orange over the top (PAF ¶ 55; DSOF ¶ 108). Mrs. Zitzka's painting covered three sidewalk squares (DSOF ¶ 108). On May 30, 2005, Officer Borgardt observed the white or gray paint covering up the word "SLUT" but not the orange paint, and he did not believe there was anything wrong with it at the time (DSOF ¶ 115; Defs.' Ex. BH: 7/23/07 Criminal Trial Tr. at 26-28).

On June 2, 2005, Lieutenant Sandford assigned Detective Dale to investigate the Zitzkas for criminal defacement of property (DSOF ¶ 106). The Zitzkas' neighbor Ms. Majewski told Detective Dale that she observed Mrs. Zitzka spraying white paint on the sidewalk on May 28, 2005, and on May 30, 2005, she saw Mrs. Zitzka shaking a can of spray paint and bending over the sidewalk (DSOF ¶ 110). On June 10, 2005, Detective Dale signed a criminal complaint on behalf of the Village of Westmont for criminal defacement of property against Mrs. Zitzka, and the court issued an arrest warrant on that charge (DSOF ¶ 121).

### 6.

The WPD also became involved in various incidents between Mrs. Zitzka and Mrs. A's family, whom the Zitzkas alleged had hosted an underage drinking party on September 25, 2004. On June 4, 2005, Mrs. Zitzka flagged down Officer Gritzenback (who is not a party in this case) to report an underage drinking party at the A home (DSOF ¶ 75). It turned out that there was no drinking party in progress, but rather an eighth grade graduation party for Mrs. A's son, JA (*Id.*). Mrs. A called the WPD to report that Mrs. Zitzka was driving by her home (DSOF ¶ 76).

On June 12, 2005, JA reported to the police that Mrs. Zitzka gave him a mean look and displayed her middle finger to him (PAF ¶ 45). Mrs. A was not present at that time (*Id.*). Officer

Newton, who had never before seen criminal charges resulting from someone displaying their middle finger, referred the matter to detectives for investigation (PAF ¶ 46). Lieutenant Sandford assigned the case to Detective James Gunther (who is not a party in this case), who prepared a complaint charging Mrs. Zitzka with criminal disorderly conduct for Mrs. A to sign (PAF ¶¶ 45-46). The complaint did not state that it was based on showing a middle finger; rather, it alleged a "lewd gesture in such an unreasonable manner as to alarm and disturb . . . this provoked a breach of the peace" (PAF ¶ 47). Detective Gunther obtained a warrant for Mrs. Zitzka's arrest for disorderly conduct on June 15, 2005 (*Id.*).

## D.

When Mr. and Mrs. Zitzka were arrested on the aforementioned warrants in June 2005, they had the following interactions with members of the WPD.

## 1.

Mrs. Zitzka was arrested on June 15, 2005, pursuant to the warrant for disorderly conduct (PAF ¶ 58). That day, Officer Newton was on routine patrol when Detective Schlicher radioed seeking assistance from Westmont units in the area of 55th Street west of Cass Avenue to make an arrest on an outstanding warrant (DSOF ¶ 88). Officer Newton responded that he was in the area, and Detective Schlicher advised that he was following a white Ford F150 southbound on Washington Street from 55th Street being driven by Mrs. Zitzka, and that there was an outstanding warrant for her arrest for disorderly conduct (*Id.*). At Detective Schlicher's request, Officer Newton conducted a traffic stop of that vehicle (DSOF ¶ 89). After confirming Mrs. Zitzka's identification, Officer Newton, with assistance from Officer Malloy (who is not a party in this case), handcuffed her and transported her to the WPD to be processed (*Id.*).

19

**2.**

The next day, June 16, 2005, Mrs. Zitzka was arrested by Detective Schlicher and Officer Weibler (who is not a party in this case) pursuant to the warrants for criminal trespass and telephone harassment (DSOF ¶ 90; PAF 59). Ms. Goetschel, for whom Mrs. Zitzka worked as a "home helper" under the auspices of the Department of Human Services in DuPage County, was in the car with Mrs. Zitzka when the arrest occurred (PAF ¶ 60; Defs.' Ex. E: Mrs. Zitzka Dep. at 17). Detective Schlicher broke the car door handle trying to reach Mrs. Zitzka (PAF ¶ 61), and then, according to Ms. Goetschel, Detective Schlicher threw Mrs. Zitzka against his car forcefully and handcuffed her (PAF ¶ 60).[6]

That day, Officer Newton was on routine patrol when he was called to assist with a traffic stop (DSOF ¶ 91). When he arrived, Mrs. Zitzka was already handcuffed, and Detective Schlicher instructed him to put her in his police vehicle and transport her to the WPD (*Id.*). Ms. Goetschel testified that Detective Schlicher ordered an officer to retrieve the camera of a witness who tried to take photos of the arrest (PAF ¶ 62).

When Mrs. Zitzka arrived at the station, Detective Dale attempted to serve her with the additional warrant for criminal defacement of property, and when Mr. Zitzka came to pick up his wife, Detective Dale attempted to serve him with the warrant for battery from the May 27 incident (DSOF ¶ 122). The Zitzkas told him that they could not be arrested because the charges were facing a motion to quash (Pls.' Resp. to DSOF ¶ 122). Detective Dale then released the Zitzkas and returned Mrs. Zitzka's bond (DSOF ¶ 124; Pls.' Resp. to DSOF ¶ 124).

---

[6] According to Ms. Goetschel, she soon thereafter terminated Mrs. Zitzka's employment because she was afraid of the WPD (PAF ¶ 28). Mrs. Zitzka was employed by the Department of Human Services in DuPage County, and she worked as a home helper for Ms. Goetschel for about two months (Defs.' Ex. E: Mrs. Zitzka Dep. at 17).

**3.**

On June 17, 2005, Sergeant Bright, the shift supervisor, informed Detective Dale that a motion to quash did not invalidate an arrest warrant unless it was granted by the court (DSOF ¶ 125). Detective Dale contacted the clerk of the court and verified that the Zitzkas' motion to quash had not been ruled on (DSOF ¶ 126). On June 18, 2005, when the Zitzkas called the WPD to report that an egg had been thrown on their driveway (DSOF ¶ 127), Sergeant Bright responded to the call with Officer Rainaldi (who is not a party in this case) to help serve the arrest warrants for criminal defacement to property and battery (DSOF ¶ 128). Sergeant Bright arrested Mr. Zitzka for criminal battery and Mrs. Zitzka for criminal defacement of property (PAF ¶¶ 64-65; DSOF ¶ 136). The Zitzkas' three children were present at home during the arrest (PAF ¶ 66).

**E.**

None of the arrests led to guilty charges against Mr. or Mrs. Zitzka. Mrs. Zitzka was found not guilty of disorderly conduct on September 7, 2005 (PAF ¶ 84).[7] On January 3, 2006, the Circuit Court of DuPage County entered a finding of not guilty following a bench trial on the misdemeanor battery charge against Mr. Zitzka (DSOF ¶ 140). On May 31, 2006, the Zitzkas moved to Indiana (PAF ¶ 78). Over a year later, on July 23, 2007, following a bench trial, the Circuit Court of DuPage County entered a finding of not guilty on the criminal defacement of property charge against Mrs. Zitzka (DSOF ¶ 141). On the same day, the criminal trespass and telephone harassment cases against her were dismissed *nolle prosequi*, or for want of prosecution, on the prosecutor's motion after the prosecution's witnesses did not appear and the court denied the State's motion to continue those trials (DSOF ¶¶ 142-46).

---

[7]There is no further information in the record on the dismissal of these charges (*see* Defs.' Ex. BH).

Defendants argue that they are entitled to summary judgment on each of the four remaining claims in plaintiffs' complaint: First Amendment retaliation, Fourth Amendment false arrest, intentional infliction of emotional distress, and malicious prosecution. Plaintiffs assert these four counts against each defendant sued in the complaint: Westmont, Detective Schlicher, Detective Dale, Officer Newton, Officer Compton, Sergeant Bright, and Officer Boyer. Although plaintiffs' allegation that defendants violated the Fourth Amendment follows their First Amendment claim in the complaint, we address the Fourth Amendment claim first, as the Fourth Amendment claim's question of probable cause affects certain of plaintiffs' other claims.

## A.

Plaintiffs assert that defendants violated their Fourth Amendment rights by arresting them without probable cause. A plaintiff claiming that he was arrested without probable cause carries the burden of establishing the absence of probable cause. *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009). Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and Section 1983. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010).

The probable cause inquiry is an objective one. *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010). Probable cause requires only a probability or substantial chance of criminal activity; the evidence need not show that the officer's belief was more likely true than false. *Purvis v. Oest*, – F.3d –, 2010 WL 2991137, at *8 (7th Cir. Aug. 2, 2010). "Probable cause exists if, at the

---

[8]Defendants' joint memorandum in support of summary judgment is cited as "Defs.' Mem." (doc. # 123), and plaintiffs' memorandum in opposition is cited as "Pls.' Opp. Mem." (doc. # 136).

time of the arrest, the facts and circumstances within the defendant's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Stokes*, 599 F.3d at 622. A court evaluates probable cause not with the benefit of hindsight, "but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Id.*

An officer may base a determination of probable cause on information from a single putative victim or eyewitness if the officer reasonably believes that the victim is telling the truth. *McBride*, 576 F.3d at 707; *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). "In crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). However, if the victim's or witness's information would lead a reasonable officer to be suspicious, the officer has a duty to pursue reasonable avenues of investigation and may not close his or her eyes to facts that would clarify the situation. *McBride*, 576 F.3d at 707; *Beauchamp*, 320 F.3d at 743. Whether or not an officer must conduct some investigation before making an arrest depends on factors including the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime. *Stokes*, 599 F.3d at 625.

A police officer's probable cause determination depends on the elements of the applicable criminal statute. *Stokes*, 599 F.3d at 622. Accordingly, we address the probable cause determination for each arrest separately.

23

On April 19, 2005, Mrs. O contacted Detective Schlicher to report that Mrs. Zitzka had made a harassing telephone call to her house claiming to be her son's girlfriend (Defs.' Ex. AA: 4/19/05 Incident Report at 2). Mrs. O "trapped" the telephone number to trace from where the call was placed (*Id.*). On June 13, 2005, AT&T sent a fax to Detective Schlicher listing the telephone number from which the call was placed (Pls.' Ex. 10). The fax did not report to whom the telephone number belonged (*Id.*). A complaint was prepared against Mrs. Zitzka for harassment by telephone on June 13, 2005, and Mrs. O signed the complaint on June 15, 2005 (Defs.' Ex. AW). The judge issued the arrest warrant on June 15, 2005, and Mrs. Zitzka was arrested on June 16, 2005 (*Id.*).

Detective Schlicher testified in his deposition that sometime after June 16, 2005, he determined that the April 19, 2005, call came from a cellular telephone belonging to a juvenile girl from Westmont unrelated to the Zitzkas (*see* Defs.' Ex. J: Schlicher Dep. at 361-62, 373, 376). Detective Schlicher spoke with the girl, who told him that she had never lent her telephone to any of the Zitzkas, but that Mrs. Zitzka may have attended a soccer game that the girl also had attended on April 19, 2005 (*Id.* at 362-63, 374-75).

In a supplemental report dated July 4, 2005, Detective Schlicher reported that Mrs. O told him that she knew Mrs. Zitzka was the caller because she recognized her voice, even though the caller did not identify herself (Defs.' Ex. AA: 7/4/05 Supp'l Report). In that report, Detective Schlicher indicated that he was "currently working on obtaining the account holder" of the telephone number from which the April 19, 2005, call was made (*Id.*). Although Detective Schlicher testified that the attorneys prosecuting the matter should have seen the information about the telephone trace

24

in a police report (Schlicher Dep. at 376-77), the source of the telephone call was not indicated on any police report in the record.

On July 23, 2007, the day the telephone harassment case was set for trial, Detective Schlicher told the prosecutors of the results of the telephone trace (Schlicher Dep. at 378). None of the O family appeared in court that day to testify on the matter (Defs.' Ex. BH: 7/23/07 Trial Tr. at 8). The prosecutor made an oral motion for a continuance, but the court denied the motion (*Id.*). Therefore, the state moved to *nolle prosequi* the case (*Id.* at 9). Mrs. Zitzka's attorney demanded a trial, but the judge granted the prosecutor's motion (*Id.*).

Plaintiffs appear to argue that Detective Schlicher violated Mrs. Zitzka's Fourth Amendment rights when he obtained the arrest warrant for telephone harassment, because he knew or should have known that the allegedly harassing telephone call came from someone other than Mrs. Zitzka based on the results of AT&T's trace of the call on June 13, 2005. Detective Schlicher contends that based on Mrs. O's complaints and his own investigation, he had probable cause to arrest Mrs. Zitzka (Schlicher Mot. at 9). Plaintiffs argue that at a minimum, there is a genuine issue of material fact as to whether probable cause existed to issue a warrant for the arrest of Mrs. Zitzka for telephone harassment.

The criminal complaint against Mrs. Zitzka indicates the charged offense was "harassment by telephone." Although harassment by telephone is addressed in 720 ILCS § 135/1-1, the criminal complaint cites to 720 ILCS § 135/1-2, which addresses harassment through electronic communications (Defs.' Ex. AW). The operative elements of the statutes for purposes of probable cause, however, are the same: whether Mrs. Zitzka made the telephone call or electronic communication, and whether it was made with the intent to harass the O family.

Plaintiffs carry the burden to establish that there was no probable cause for Mrs. Zitzka's arrest, *McBride*, 576 F.3d at 706, and they will succeed in showing Detective Schlicher violated Mrs. Zitzka's Fourth Amendment rights "only if a reasonably well-trained officer in [his] position should have known that the information he provided in support of the warrant would have failed to establish probable cause that he should not have applied for the warrant in the first place." *Mannoia v. Farrow*, 476 F.3d 453, 457-58 (7th Cir. 2007). Plaintiffs must identify evidence in the record showing that Detective Schlicher "knowingly or intentionally or with a reckless disregard for the truth," made false statements to the judge issuing the warrant that were necessary to the determination of probable cause or "failed to inform the judge of facts that he knew would detract from a finding of probable cause." *Id.* at 458. "A 'reckless disregard for the truth' is demonstrated by showing that the officers entertained serious doubts as to the truth of their statements [or] had obvious reasons to doubt the accuracy of the information reported." *Beauchamp*, 320 F.3d at 743. "[A]n officer may not close his or her eyes to clearly exculpatory facts . . ." *Stokes*, 599 F.3d at 624.

Plaintiffs argue that Detective Schlicher closed his eyes to clearly exculpatory facts when he sought the arrest warrant for telephone harassment because at that time, he knew the number from which the telephone call at issue was made, and he either determined or could have determined with some investigation that the telephone number did not belong to the Zitzkas. As explained above, an officer may be required to conduct an investigation before making an arrest depending on the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime. *Stokes*, 599 F.3d at 625. In this case, Detective Schlicher was well aware that the O family and the Zitzka family had had numerous confrontations since at least late October 2004, and that the WPD had responded to several

26

incidents of alleged harassment between the O family and the Zitzka family in April and May of

2005 alone (*see, e.g.*, Defs.' Ex. Z: 4/19/05 Incident Report at 1-3; Defs.' Ex. AB: 4/21/05 Incident

Report at 2; Defs.' Ex. AD: 5/16/05 Incident Report at 2).

In light of the history of confrontation between the two families, and the fact that Detective

Schlicher had the AT&T trace report of the telephone call in hand as of June 13, 2005, a jury

reasonably could find that Detective Schlicher should have investigated the source of the telephone

number before seeking the complaint and arrest warrant for Mrs. Zitzka. Instead, as late as July 4,

2005, Detective Schlicher still had not verified to whom the telephone number traced by AT&T

belonged. There was no danger of imminent repetition that required immediate action: the harassing

call allegedly occurred on April 19, 2005, and there is no allegation of additional harassing calls in

the nearly two months that passed before the complaint and arrest warrant issued. Thus, there is a

genuine issue of material fact as to whether Detective Schlicher had probable cause to obtain a

warrant for the arrest of Mrs. Zitzka for telephone harassment on June 15, 2005.

**2.**

Plaintiffs also argue that Officer Newton should have known that there was no probable cause

behind the warrant for telephone harassment, and thus, that he violated Mrs. Zitzka's Fourth

Amendment rights by arresting her. In a supplemental report dated June 21, 2005, Officer Newton

reported that on June 16, 2005, he responded to the area of 521 South Washington Street to transport

a prisoner for Detective Schlicher (Defs.' Ex. AA: 6/21/05 Supp'l Report). Mrs. Zitzka was

handcuffed by Detective Schlicher before Officer Newton arrived on the scene, and Detective

Schlicher secured Mrs. Zitzka in the rear of Officer Newton's squad car (*Id.*). Officer Newton

transported her to the WPD and was met in the booking room by Detectives Dale and Schlicher, who provided Officer Newton with copies of a complaint and warrant for telephone harassment (*Id.*)

Facially valid arrest warrants carry a presumption of validity. *Suarez v. Town of Ogden Dunes, Ind.*, 581 F.3d 591, 597 (7th Cir. 2009). Here, Detective Schlicher handed Officer Newton the facially valid complaint and arrest warrant at the WPD station. Under the "collective knowledge doctrine," the police officer who actually makes the arrest need not personally know all the facts that constitute probable cause if he or she is reasonably acting at the direction of another officer whose knowledge is sufficient to constitute probable cause. *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005). Moreover, in this instance, Officer Newton was Mrs. Zitzka's "temporary custodian and nothing else," as he simply transported her from the location of her arrest to the police station for booking. *Morfin v. City of East Chicago*, 349 F.3d 989, 1000-01 (7th Cir. 2003). Officer Newton's actions, pursuant to a facially valid warrant and orders from his superior officer, cannot form the basis for a Fourth Amendment violation.

To be sure, the Fourth Amendment forbids execution of a facially valid warrant if the arresting officer knew the warrant was not supported by probable cause. *Juriss v. McGowan*, 957 F.2d 345, 350-51 (7th Cir. 1992). Here, however, plaintiffs offer no evidence that Officer Newton knew about the trace of the telephone call, and thus there was no cause for him to doubt the validity of the arrest. Plaintiffs argue that the entire WPD was out to get Mrs. Zitzka, and that Officer Newton thus had reason to doubt the validity of the arrest. However, the argument that a dispute between a citizen and the police department requires an officer to assume that any complaint and arrest warrant involving that citizen is invalid proves too much. We grant Officer Newton summary judgment on Mrs. Zitzka's Fourth Amendment claim against him in connection with this arrest.

28

**B.**

The next incident that resulted in an arrest occurred on May 27, 2005. That evening, Mr. Zitzka found vandals outside his home. He caught two of the vandals, AMM and PK, and dragged them by their hoodies. PK struck Mr. Zitzka in the face, and AMM and PK reported that Mr. Zitzka swung at PK but missed and hit AMM in the nose instead. Mr. Zitzka, in contrast, contends that PK struck AMM. The Zitzkas' neighbors heard Mr. Zitzka screaming at PK and AMM. Detective Dale took charge of the investigation, and PK's and AMM's parents signed complaints against Mr. Zitzka for battery. A judge issued a warrant for Mr. Zitzka's arrest, and Mr. Zitzka was arrested by Sergeant Bright on June 18, 2005.

Plaintiffs appear to argue that the police did not have probable cause to arrest Mr. Zitzka because he was attempting to stop a trespass to his home when the alleged battery occurred. Under Illinois law, battery is committed when a person intentionally or knowingly by any means, and without legal justification, causes bodily harm to another individual, or makes physical contact of an insulting or provoking nature to an individual. 720 ILCS § 5/12-3(a). The existence of a legal justification for battery is not an element of the offense, but rather is an affirmative defense. *McBride*, 576 F.3d at 707. Although the officer "may not ignore conclusively established evidence of the existence of an affirmative defense, the Fourth Amendment imposes no duty to investigate whether a defense is valid." *Id.* (internal quotations omitted). Here, the evidence was far from "conclusively established" that Mr. Zitzka had an affirmative defense to battery. As in *McBride*, the investigating officers interviewed witnesses and observed bruising on the putative victims, and then reasonably determined that Mr. Zitzka intentionally made physical contact with them. *Id.* at 707-08.

29

Therefore, Detective Dale had probable cause to seek an arrest warrant for Mr. Zitzka. This is an absolute defense to the Fourth Amendment charge.

Likewise, Sergeant Bright had probable cause to arrest Mr. Zitzka based on the complaints signed by the putative victims and Detective Dale's investigation of the circumstances surrounding the incident. There is no evidence that Sergeant Bright ignored exculpatory information when he arrested Mr. Zitzka, and as explained above, even if Mr. Zitzka was legally justified in grabbing or swinging at PK or AMM, this would be an affirmative defense that does not preclude probable cause to arrest. *See Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 899 (7th Cir. 2001).

## C.

The next warrant issued against the Zitzkas also stemmed from the events of May 27, 2005. That night, as explained above, a minor spray painted the word "SLUT" in black on the public sidewalk in front of the Zitzka home. Between May 28 and May 30, 2005, Mrs. Zitzka painted a base coat of white or gray paint over the graffiti, and then painted "♥ Jesus" in orange on top. On May 30, 2005, Officer Borgardt observed the white or gray paint covering up the word "SLUT" but not the orange paint, and he did not believe there was anything wrong with it at the time. Detective Dale – who had already interviewed Mr. Zitzka in connection with the battery incident – was assigned to investigate, and on June 10, 2005, he signed a criminal complaint on behalf of the Village of Westmont for criminal defacement of property against Mrs. Zitzka, and the court issued an arrest warrant on the charge. After speaking with Detective Dale about the warrant, Sergeant Bright executed the arrest warrant on June 18, 2005.

30

In Illinois, a person commits the crime of criminal defacement of property when they "knowingly damage the property of another without his or her consent by defacing, deforming, or otherwise damaging property, by the use of paint or any other similar substance, or by the use of a writing instrument, etching tool, or any other similar device." 720 ILCS § 5/21-1.3. Plaintiffs argue that Detective Dale did not have probable cause to arrest Mrs. Zitzka because she had Officer Borgardt's consent to spray paint the sidewalk.

Whether or not Officer Borgardt told Mrs. Zitzka that she could paint the sidewalk, there is no evidence that Officer Borgardt had the authority to consent on behalf of Westmont or that he held himself out as having that authority. Under Illinois law, an agent must have explicit authority from the municipality to bind the municipality. *See, e.g., Chicago Food Mgmt., Inc. v. City of Chicago,* 516 N.E.2d 880, 883 (Ill. App. Ct. 1987). Whether or not Mrs. Zitzka believed Officer Borgardt had the authority to give her permission to paint the sidewalk, a municipality cannot be estopped by an act of its agent beyond the authority conferred upon him. *Id.* at 645. Moreover, even if Mrs. Zitzka had permission to cover up the word "slut," she was not authorized to substitute her own personal, religious message on the Village's property. Accordingly, Detective Dale had probable cause to obtain an arrest warrant for Mrs. Zitzka, and Sergeant Bright had probable cause to arrest her on the charge of criminal defacement of property.

**D.**

The next arrest warrant for Mrs. Zitzka arose from the incident of May 30, 2005. In the police report from that day, Officer Lawrence reported that Mr. O related that Mrs. Zitzka was harassing MO and shouting at him, and MO's younger brother reported seeing Mrs. Zitzka standing on the sidewalk in front of the O house (Pls.' Ex. 19 at 4). Mrs. Zitzka related to Officer Lawrence

31

that she was driving in front of the O's house when she saw MO running down his driveway toward her car, and Mr. O's vehicle then pulled in front of her car (*Id.*). Mrs. Zitzka related that she then put her vehicle in reverse, and Mr. O's vehicle pursued her vehicle in reverse, at which point Mr. O lost control of his vehicle and struck a utility pole (*Id.*).

Detective Schlicher wrote up a supplemental incident report on June 30, 2005 (Pls.' Ex. 21). In the report, he indicated that the O family complained that Mrs. Zitzka had been harassing their family for several months, including driving down their street and swearing out her vehicle window at them and their son (*Id.* at 1). This report indicated that MO stated that Mrs. Zitzka was on the grass inside the sidewalk, on the O family's property. Mr. and Mrs. O signed a complaint against Mrs. Zitzka, and on June 15, 2005, Detective Schlicher obtained an arrest warrant against her for criminal trespass to land (*Id.;* PAF ¶ 43; DSOF ¶ 85).

Plaintiffs argue that Detective Schlicher did not have probable cause to obtain an arrest warrant because MO's younger brother, from the window of the O house, observed Mrs. Zitzka standing on the sidewalk, rather than on the O's property. Detective Schlicher, however, relied on the later testimony of MO – who was closer to Mrs. Zitzka – that Mrs. Zitzka was on the O's property, not the sidewalk, during their confrontation. While an officer may base a determination of probable cause on information from a single witness if the officer reasonably believes he or she is telling the truth, if the witness's information would lead a reasonable officer to be suspicious, the officer has a duty to pursue reasonable avenues of investigation. *McBride*, 576 F.3d at 707; *Beauchamp*, 320 F.3d at 743. A witness's motive is one of the factors to be considered in assessing the totality of circumstances supporting probable cause. *People v. Jardon*, 913 N.E.2d 171, 184 (Ill. App. Ct. 2009); *see also People v. Rice*, 651 N.E.2d 1083, 1085 (Ill. 1995) (holding that cross

32

examination at a preliminary hearing may include interrogation necessary to show "interest, bias, prejudice, or motive of the witness, to the extent that these factors are relevant to the question of probable cause").

Here, a jury reasonably could find that an officer in Detective Schlicher's position should have been skeptical of MO's testimony as to where Mrs. Zitzka was standing due to the ongoing conflict between the Zitzka family and the O family, especially in light of the conflicting witness testimony about where Mrs. Zitzka was standing. Moreover, none of the other factors which could warrant making an arrest before conducting further investigation – the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime, *Stokes*, 599 F.3d at 625 – were present here. Thus, there is a triable issue as to whether Detective Schlicher lacked probable cause to obtain an arrest warrant for criminal trespass to property. For this reason, the claim survives summary judgment.

**E.**

The last arrest warrant at issue in this case arose from an incident on June 12, 2005. Officer Newton reported that JA related to the police that Mrs. Zitzka, in her car, pulled up in back of him as he crossed the street on foot, and she "looked directly at him with a mean look on her face and proceeded to give him the middle finger" (Defs.' Ex. AL: 6/12/05 Incident Report). Mrs. A wanted the incident documented, but did not indicate that she wanted to sign a criminal complaint (*Id.*).

Lieutenant Sandford assigned the case to Detective Gunther, who prepared a complaint charging Mrs. Zitzka with criminal disorderly conduct in violation of 720 ILCS § 5/26-1(a)(1). Mrs. A and Officer Newton signed the complaint, which stated that Mrs. Zitzka "knowingly and intentionally displayed a lewd gesture to [JA], a juvenile, in such an unreasonable manner as to alarm

33

and disturb [JA] and provoke a breach of the peace" (Defs.' Ex. AY). Detective Gunther signed the warrant for Mrs. Zitzka's arrest for disorderly conduct on June 15, 2005, and that day, at Detective Schlicher's request, Officer Newton conducted a traffic stop of Mrs. Zitzka's vehicle, handcuffed her, and transported her to the WPD.

Under Illinois law, a person commits disorderly conduct when he or she knowingly "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS § 5/26-1(a)(1). A person's conduct "must actually bring about a breach of the peace, not merely tend to do so." *Stokes*, 599 F.3d at 622.

In determining whether plaintiffs have shown that there is a genuine issue of material fact as to whether Detective Schlicher and Officer Newton had probable cause to obtain a warrant and conduct the arrest for disorderly conduct, the Court must determine whether a reasonably well-trained officer in their position should have known that the information Officer Newton provided in support of the warrant for disorderly conduct would have failed to establish probable cause. *Stokes*, 599 F.3d at 622; *Mannoia*, 476 F.3d at 457-58. In the incident report, Officer Newton stated that Mrs. Zitzka gave JA a mean look and her middle finger. However, the complaint Officer Newton signed stated that Mrs. Zitzka "knowingly and intentionally displayed a lewd gesture . . . in such an unreasonable manner as to alarm and disturb . . . and provoke a breach of the peace." Officer Newton had never heard of a person being charged with disorderly conduct for showing someone their middle finger, and neither have we. Moreover, there is no evidence that an actual breach of the peace occurred because of the incident. Thus, we find that there is a genuine issue of material fact as to whether Officer Newton violated the Fourth Amendment in obtaining the arrest warrant for disorderly conduct in the absence of probable cause. Likewise, there is a genuine issue

34

of material fact as to whether Detective Schlicher was aware of the "the middle finger" basis for the

warrant when he ordered Officer Newton to arrest Mrs. Zitzka for disorderly conduct.[9]

## IV.

Next, plaintiffs allege that defendants took various adverse actions against them in retaliation

for their speech critical of the WPD. In order to establish a *prima facie* case of First Amendment

retaliation, plaintiffs must show that: (1) their speech was constitutionally protected; (2) they

suffered a deprivation likely to deter free speech; and (3) the speech was the *but-for* cause of the

defendants' action. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 500-01 (7th Cir.

2010).[10] Plaintiffs here attempt to show retaliation through the direct method: they point to various

documents that they contend constitute "admissions" that defendants retaliated against them, and

they do not apply the Title VII burden-shifting used in retaliation cases proved through the indirect

method (Pls.' Opp. Mem. at 1, 13-14).[11] Where the plaintiff sets forth a direct case of retaliation,

---

[9]Furthermore, defendants are not entitled to qualified immunity on the Fourth Amendment claims. Qualified immunity protects officers who "reasonably but mistakenly conclude that probable cause is present." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 10103 (7th Cir. 2006). Here, however, Officer Newton admitted that he had never heard of a middle finger disorderly conduct charge, and it is well-settled that arresting an individual without probable cause violates the law. Thus, Officer Newton and Detective Schlicher are not entitled to qualified immunity on this claim. *See Alexander v. City of Milw.*, 474 F.3d 437, 443 (7th Cir. 2007).

[10]The parties in this case omitted but-for causation as a requirement of the prima facie case. However, the Seventh Circuit has interpreted the Supreme Court's holding in *Gross v. FBL Fin. Serv., Inc.*, – U.S. –, 129 S.Ct. 2343, 2351 (U.S. 2009), as clarifying that unless a federal statute provides otherwise, the plaintiff in a First Amendment retaliation case bears the burden of demonstrating but-for causation. *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009). Prior to *Gross*, the Seventh Circuit had required a plaintiff's speech to be a "motivating factor" rather than a but-for cause to establish a *prima facie* case of First Amendment retaliation.

[11]Plaintiffs recite the burden-shifting standard in their summary judgment briefing, but do not explain how it would to the evidence in this case (*see* Pls.' Opp. Mem. at 14-15). We note that the Seventh Circuit has raised the question of whether the burden-shifting approach survives after *Gross* gave the plaintiff the burden of demonstrating but-for causation. *See Kodish*, 604 F.3d at 501 (stating that "[w]hether such a burden shifting analysis survives the Supreme Court's declaration in *Gross* in non-Title VII cases, remains to be seen"). We share in the Seventh Circuit's skepticism as to whether the burden-shifting approach retains vitality after *Gross*, because the evidence needed to make out a *prima facie* case of but-for causation under the direct method will be the same evidence a plaintiff would use to show that a defendant's stated reasons were merely a pretext for the adverse action taken against the plaintiff under the indirect, burden-shifting method. As such, our rulings with regard to plaintiffs' First Amendment retaliation claims would be the

the plaintiff must demonstrate a triable issue of fact as to whether retaliation was the but-for cause of the adverse employment action. *Kodish*, 604 F.3d at 501. While the evidence must point directly to a retaliatory reason for the adverse action, "direct proof of discrimination is not limited to near-admissions by the [defendant] that its decisions were based on a proscribed criterion (*e.g.*, 'You're too old to work here.'), but also includes circumstantial evidence which suggests [retaliation] through a longer chain of inferences." *Id.* The evidence presented "may require a chain of inference, but it is direct evidence nevertheless." *Kodish*, 604 F.3d at 501-02.

Here, we find that plaintiffs presented direct evidence – in the form of facts, taken in the light most favorable to them – of retaliation sufficient to survive summary judgment.

## A.

"[O]utside the employment context the First Amendment forbids retaliation for speech even about private matters." *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009) (internal citations omitted). Plaintiffs have shown, and defendants do not dispute, that Mr. and Mrs. Zitzka engaged in certain constitutionally protected speech. *First*, from late October 2004 through April 2005, Mrs. Zitzka kept a sign on the Zitzka family automobile which read, "The Westmont Police Do Not Serve or Protect." *Second*, from late October to early November 2004, Mr. Zitzka displayed a sign on his truck which read, "The Westmont Police Do Not Serve or Protect. Why Are We Paying Their Salaries?" *Third*, on April 28, 2005, Mrs. Zitzka made a speech before the Westmont Committee of the Whole, criticizing the WPD and Detective Schlicher's handling of the investigation into the alleged rape of Miss Zitzka. *Fourth*, after Detective Schlicher closed the investigation into the alleged rape of Miss Zitzka and the alleged underage drinking at Mrs. A's home, Mrs. Zitzka

---

same under either the direct or indirect method of proof.

contacted the DuPage County State's Attorney's office to demand further investigation into these matters.

Defendants argue that unlike Mr. and Mrs. Zitzka, the three minor plaintiffs – the Zitzka children – did not engage in protected speech and thus, that Count I should be dismissed as to the minor children (Defs.' Joint Mem. at 26). Mr. and Mrs. Zitzka respond that their minor children – aged thirteen, eight, and three and a half at the time – "agreed" to place the signs on the Zitzka family automobiles and thus engaged in protected speech (*see* Pls.' Ex. 1: Mrs. Zitzka Decl. at 2). We disagree. The Zitzka parents made the decision to put signs on the automobiles. The minor children had no choice but to ride in the family automobiles, and the two youngest children may not have even understood the meaning of the signs. Plaintiffs do not point to any case law suggesting that children engage in First Amendment activity merely by virtue of their parents' activity. Thus, only Mr. and Mrs. Zitzka's claims of retaliation remain.[12]

## B.

Next, plaintiffs allege that because of their First Amendment activity, they suffered several deprivations likely to deter free speech, including being subjected to the five misdemeanor prosecutions discussed above, being arrested in a harassing manner, having the WPD repeatedly drive by or sit in their cars near the Zitzka house and stare or look at the Zitzkas, and being threatened with arrest if Mrs. Zitzka did not cease calling the State's Attorney's office. Under Section 1983, a deprivation under color of law that is likely to "deter a person of ordinary firmness" from exercising First Amendment activity in the future is actionable. *Bridges*, 557 F.3d at 552;

---

[12]Although the parties agree that Miss Zitzka told police about the alleged underage drinking party and the alleged rape against her, plaintiffs do not contend that any of the defendants retaliated against them for Miss Zitzka's speech.

*Valentino*, 575 F.3d at 670; *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533-34 (7th Cir. 2006). We apply an objective test to determine whether an action is materially adverse, but whether it meets that standard depends on the context and circumstances of the particular case. *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009). Defendants do not dispute that the five arrests and criminal prosecutions undertaken against the Zitzkas would satisfy this standard. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out. . . ." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

Defendants dispute, however, that their other actions were likely to "deter a person of ordinary firmness" from exercising First Amendment activity. Plaintiffs allege that a materially adverse action was taken against them when Officers Boyer and Compton visited their home on March 10, 2005, and threatened Mrs. Zitzka with arrest if she did not stop calling the State's Attorney's office. "[A] realistic threat of arrest is enough to chill First Amendment rights." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004). Thus, a jury reasonably could find that coming to the Zitzka home and threatening Mrs. Zitzka with arrest would constitute an actionable deprivation.

Plaintiffs also allege that two of the arrests were conducted inappropriately and constituted adverse actions. On June 16, 2005, Detective Schlicher broke the door handle on the car Mrs. Zitzka was driving when he arrested her for criminal trespass and telephone harassment. Plaintiffs further allege that Detective Schlicher threw Mrs. Zitzka against his car forcefully before he handcuffed her. Defendants do not contend that Mrs. Zitzka was resisting arrest, or that Detective Schlicher was

38

justified in breaking the car door handle and handcuffing Mrs. Zitzka roughly against the car.[13] Plaintiffs appear to argue that this force – while not alleged to be excessive – constituted an adverse action. Indeed, use of this kind of physical force – done without justification – would "deter a person of ordinary firmness" from exercising First Amendment activity, especially a person whose alleged crimes were non-violent misdemeanors.

By contrast, the manner of arrest on June 18, 2005, does not constitute an adverse action. That day, Sergeant Bright and Officer Rainaldi arrested Mrs. Zitzka pursuant to the warrant for criminal defacement of property. Plaintiffs allege that this arrest constituted an actionable deprivation because it occurred in front of the Zitzkas' three children. We disagree. There is no case law that suggests that the fact that an arrest occurred in front of an arrestee's minor children turns the arrest into an actionable adverse action.

Next, plaintiffs point to a number of police "drive-bys," where Mrs. Zitzka observed certain officers driving past or sitting in their cars near her house. Sergeant Bright admitted that he ordered extra watches and "drive-bys" of the Zitzka house (PAF ¶ 27). This means that an officer in the relevant patrol district area would make an extra pass during his shift or sit and watch the area where the extra watch was ordered (Defs.' Ex. M: Bright Dep. at 21). Detective Dale estimated that he sat in his unmarked squad car near the Zitzka house on five or six occasions (Defs.' Ex. L: Dale Dep.

---

[13]Plaintiffs do not claim that defendants' use of handcuffs by itself was an adverse action; however, even if plaintiffs' complaint could be read to allege this as an adverse action, the use of handcuffs in the course of an arrest does not constitute an adverse action in and of itself. *See, e.g., Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) (holding that the record established that despite the plaintiff's request to the defendant officers not to handcuff him because he thought it would hurt (and a resulting injury that required medical treatment), the officers' actions in arresting him were reasonable because they did not use handcuffs in a manner that would clearly injure or harm a typical arrestee); *see also Ricci v. Arlington Heights, Ill.*, 116 F.3d 288, 291 (7th Cir. 1997) (holding that full custodial arrest was reasonable for violation of village ordinance).

at 102-03). Detective Schlicher testified that he sat in his car near the Zitzka house twice in an attempt to serve arrest warrants (Schlicher Dep. at 315).

"[T]rivial harms, petty slights, [and] minor annoyances," such as isolated criticism or the intimidation resulting from being stared and yelled at, may not by itself rise to the level of a materially adverse action. *Stephens*, 569 F.3d at 790; *Mosely*, 434 F.3d at 534. That said, to be actionable, retaliatory harassment need not be extreme. *Massey*, 457 F.3d at 720. A "campaign" of petty harassment that includes reprimands and ridicule or other "minor forms of retaliation" and "false accusations" may be actionable under the First Amendment if it is enough to deter the exercise of free speech. *Id.* at 720-21. In other words, a campaign of harassment "though trivial in detail may have been substantial in gross." *Id.* at 721 n.3.[14] While separately, defendants' drive-bys would not deter a reasonable person's exercise of his or her First Amendment rights, all of the drive-bys taken as a whole may have been "substantial in gross." A jury reasonably could find that the alleged drive-bys and extra watches could constitute an actionable deprivation so as to give rise to a retaliation claim. *See Lifton v. Bd. of Educ. of City of Chicago*, 416 F.3d 571, 576 (7th Cir. 2005) (assuming without deciding that the recommendation of a fifteen-day suspension, even though the suspension was not actually served, constituted a retaliatory action).[15]

---

[14]In *Massey*, the Seventh Circuit held that no rational jury could find that the sequence of events in that case amounted to a campaign of retaliation designed to deter the plaintiff's free speech, primarily because the plaintiff did not rationally link the alleged adverse actions to any particular defendant. *Massey*, 457 F.3d at 721.

[15]Defendants rely heavily on *Harris v. City of West Chicago, Illinois*, No. 01 C 7527, 2002 WL 31001888, at *3-4 (N.D. Ill. Sept. 3, 2002), for their argument that the police drive-bys and threat of arrest do not rise to the level of an actionable adverse action. In *Harris*, the plaintiffs brought suit under the Fourth and Fourteenth Amendments, alleging that they were harassed by police actions including frequent drive-bys, with or without the accompanying spotlight, and threats that the police were "going to get you and your family," as well as a "bump" that resulted in no physical injury to the plaintiffs. *Harris*, 2002 WL 31001888, at *3-4. The district court determined that a retaliation claim based on such verbal harassment and police drive-bys is not cognizable. *Harris*, however, preceded *Massey*, in which the Seventh Circuit held that "a campaign of harassment though trivial in detail may have been substantial in gross," and thus constituted an adverse action. *Massey*, 457 F.3d at 717. Relying on *Massey*, a jury reasonably could

40

Plaintiffs also appear to argue that Detective Schlicher's decision to close the investigations and not bring charges of rape against MO or charges of facilitating underage drinking against Mrs. A, and his decision to issue station adjustments to the charges against the juveniles involved in the graffiti and battery incident at the Zitzka home, constituted material adverse actions. The decision to order station adjustments for the minors in this case is not an adverse action because plaintiffs have not shown that the decision to lessen the sentence for the minors in any way affected plaintiffs' exercise of First Amendment activity. However, Detective Schlicher's decision not to pursue the rape or underage drinking investigations – which occurred the week after the signs showed up on the Zitzka automobiles – if indeed done for a retaliatory purpose, would constitute a material adverse action that would deter a reasonable person from reporting these alleged crimes.

## C.

The third element that plaintiffs must show for their First Amendment retaliation claim to survive summary judgment is that but for their First Amendment activity, defendants would not have taken the adverse actions against them. *Kodish*, 604 F.3d at 501. In other words, plaintiffs must show that defendants took the adverse actions "because of," "by reason of," or "on account of" plaintiffs' First Amendment activity. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010). At this stage, we are not required "to draw every conceivable inference from the record, . . . only reasonable ones." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005) (internal quotations omitted). In *Kodish*, the Seventh Circuit reversed the district court's grant of summary judgment in the defendant's favor because, although there was "ample evidence to support a

---

find that defendants' extra watches and drive-bys – together with the other alleged conduct – constitute actionable deprivations.

conclusion that the [adverse] actions were taken for legitimate reasons," the plaintiff presented "concrete evidence" of the defendant's comments that made it "not so incredible or implausible" that a jury would find that the adverse actions were taken because of the plaintiff's protected First Amendment activity. *Kodish*, 604 F.3d at 507-08.

As explained above, direct proof of retaliation is not limited to direct evidence such as an admission by the defendants that the adverse actions were caused by the plaintiff's speech, but also includes circumstantial evidence which suggests retaliation through a longer chain of inferences. *Kodish*, 604 F.3d at 501. "The focus of the direct method of proof thus is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption. . . . This evidence usually requires an admission from the decisionmaker about his discriminatory animus, which is rare indeed." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009) (internal citations and quotations omitted). Circumstantial evidence of retaliatory motive is more common, and may include the timing of events or the disparate treatment of similar individuals. *Massey*, 457 F.3d at 717. Evidence of a retaliatory motive together with the adverse action may be "sufficient for a circumstantial demonstration that the one caused the other." *Hartman*, 547 U.S. at 260. However, "suspicious timing alone rarely is sufficient to create a triable issue" of material fact in support of a retaliation claim. *Moser*, 406 F.3d at 905.

42

To show that the criminal prosecutions were undertaken because of the Zitzkas' protected activity, plaintiffs have the additional burden to demonstrate, as an element of their case, that there existed no probable cause to support the underlying charges. *Hartman*, 547 U.S. at 263-65. Furthermore, plaintiffs must show that the defendant officers successfully influenced and induced the prosecutor into charging them with crimes, which prosecution would not have been initiated without the officers' urging. *Id.* at 261-62. This means showing that defendant officers "committed some improper act after they arrested [plaintiffs] without probable cause, for example, that they pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up exculpatory evidence." *Snodderly*, 239 F.3d at 901.

Plaintiffs have made this showing as to the three criminal prosecutions for which plaintiffs showed a reasonable jury may find a lack of probable cause. *First*, as to the telephone harassment charge, plaintiffs have demonstrated that there is a genuine issue of material fact as to whether Detective Schlicher covered up or withheld the evidence that the telephone number from which the allegedly harassing call was made came from a telephone unrelated to the Zitzkas. Although Detective Schlicher testified that the prosecutors may have known about the telephone number from the police reports, none of the police reports in the record explain that the telephone number did not match the Zitzkas' telephones. Whether the withholding of this information was the reason the criminal prosecution went forward is an issue of fact for the jury. *Second*, plaintiffs have shown that there is a genuine issue of material fact as to whether the defendant officers withheld, covered up, or even falsified the complaint in the disorderly conduct case when they omitted the fact that the charge was based on a raised middle finger, and whether this omission caused that criminal

prosecution to go forward. *Third*, plaintiffs have presented sufficient evidence such that a reasonable jury could find that Detective Schlicher withheld or covered up the fact that MO's younger brother originally reported that Mrs. Zitzka was not on the O property during the confrontation that led to the criminal trespass to property charge, and that MO may have had a motive to cause trouble for Mrs. Zitzka.

**2.**

Unlike a claim for retaliatory prosecution, a plaintiff need not plead and prove the absence of probable cause for a retaliatory arrest claim because the causal connection needed to show retaliation is less complex: "merely between the retaliatory animus of one person [the officer] and that person's own injurious action," rather than between the officer's retaliatory animus, and the action of the prosecutor. *Hartman*, 547 U.S. at 262. Nevertheless, the absence or presence of probable cause has "powerful evidentiary significance." *Id.* at 261. As explained below, plaintiffs have presented a genuine issue of material fact as to whether certain of the remaining arrests were committed for retaliatory purposes.

In order to demonstrate that defendants were motivated by plaintiffs' First Amendment activity, plaintiffs must first show that defendants knew of their protected activity. *Gunville v. Walker*, 583 F.3d 979, 984 (7th Cir. 2009). Although "it would be rare for a plaintiff to have smoking gun evidence that a defendant knew of her protected speech or for a defendant to admit such knowledge," *Valentino*, 575 F.3d at 672, plaintiffs have sufficiently shown that the defendant officers involved in the arrests – all of the officer defendants except Officers Boyer and Compton – were aware that Mrs. Zitzka had been criticizing the WPD through signs on her vehicles, her speech before the Committee of the Whole, and/or telephone calls to the DuPage County State's

44

Attorney's office. Detective Schlicher admitted that he was aware of both the vehicle signs and Mrs. Zitzka's speech before the Committee of the Whole complaining about the WPD and his handling of Miss Zitzka's allegations of rape and underage drinking, and Officer Newton – though he claims he was not aware of the signs on the Zitzkas' vehicles before June 16, 2005[16] – was aware of Mrs. Zitzka's speech and her complaints about the WPD. In addition, Sergeant Bright admitted that he was offended by the signs on the Zitzkas' vehicles, and both he and Detective Dale discussed the signs with other WPD officers.

At the very least, plaintiffs have presented circumstantial evidence demonstrating that the Zitzkas had become a thorn in the WPD's side. This is most revealingly demonstrated in the April 19, 2005, email from Lieutenant Sandford to Chief Sticha. In an email exchange discussing Mrs. O's complaints that Mrs. Zitzka was making harassing telephone calls to her house, Lieutenant Sandford wrote that "the only thing that will stop her [Mrs. Zitzka] is to get arrested several times" (PAF ¶ 33; Defs.' Ex. CB; DSOF ¶ 65). A month later, on May 31, 2005, the chief of the WPD was still discussing the ongoing issues with the Zitzka family with his officers, as demonstrated by his notes of a meeting with Lieutenant Sandford, Detective Schlicher, and Deputy Police Chiefs Mulhearn and King. Chief Sticha's handwritten notes for the meeting state, in their entirety: "(Zitzka Caper) -Rick, Tom, Jim, Randy & Me- Ostranders[,] daughter Angel[,] Marmolejo[,] Hackney[,] Moats[,] Seedman[,] Klemz" (Pls.' Ex. 8). While his reference to the meeting as the "Zitzka Caper" is not necessarily indicative of the tone or specific content of the meeting, a jury

---

[16]Officer Newton was aware that there were messages on the Zitzkas' cars by June 16, 2005, because on that date, Lieutenant Sandford asked him to note if Mrs. Zitzka's vehicle had any new messages on its window (Pls.' Ex. 9).

45

reasonably could find that this meeting between the WPD's top brass shows that the Zitzkas were a concern for the WPD.

Soon after the May 31 meeting, in quick succession, the five complaints were issued and arrest warrants executed against the Zitzkas: on June 10, 2005, Sergeant Bright obtained the arrest warrant for battery against Mr. Zitzka, which was executed on June 18, 2005; on June 10, 2005, Detective Dale signed the criminal complaint and obtained the arrest warrant against Mrs. Zitzka for criminal defacement of property, which was executed on June 18, 2005 (after an initial failed attempt on June 16, 2005); on June 15, 2005, Detective Schlicher prepared the complaint and obtained the warrants for telephone harassment and criminal trespass to land, which were executed on June 16, 2005; and on June 15, 2005, Detective Gunther obtained a warrant for Mrs. Zitzka's arrest on the disorderly conduct charge, which was executed that same day by Officer Newton and Detective Schlicher.

This time line of arrests and discussions about the Zitzkas is circumstantial evidence of a retaliatory motive. Although defendants Detective Dale, Officer Newton, and Sergeant Bright were not parties to the email exchange between Lieutenant Sandford and Chief Sticha or the May 31, 2005, WPD meeting to discuss the Zitzkas, Lieutenant Sandford was involved in assigning the officers to investigate the Zitzkas for disorderly conduct and telephone harassment (PAF ¶ 31). It is therefore "not so incredible or implausible" that a reasonable jury could find that the suspicious time line of arrests, several based on an investigation initiated by the lieutenant who opined that "the only thing that will stop her [Mrs. Zitzka] is to get arrested several times," showed that defendants arrested the Zitzkas because of their First Amendment activity. *See Kodish*, 604 F.3d at 507-08.

46

Together with the evidence presented as to the possible lack of probable cause to arrest Mrs. Zitzka on the telephone harassment, criminal trespass to land, and disorderly conduct charges, plaintiffs have presented direct evidence of a genuine issue of material fact as to whether the defendant officers arrested Mrs. Zitzka on these charges because of her First Amendment activity.

Furthermore, despite the presence of probable cause for the arrest for criminal defacement of property, the evidence of the timing of this arrest and the WPD discussions about the Zitzkas sufficiently shows a causal connection between the arrest and the defendants' alleged retaliatory motive to raise a genuine issue of material fact as to whether the officer defendants' retaliatory motive caused the arrest. Lieutenant Sandford was involved in assigning the officers to investigate Mrs. Zitzka for this misdemeanor crime (PAF ¶ 31). While Mrs. Zitzka's painting "♥ Jesus" in orange paint may constitute criminal defacement of property under the law, plaintiffs have produced evidence showing that defendants would not have pursued her arrest on the matter but for her speech critical of the WPD. Plaintiffs have thus met their burden of establishing that Mrs. Zitzka was arrested for criminal defacement of property because of the officer defendants' retaliatory motive.

Plaintiffs, however, have not shown that retaliation for the Zitzkas' protected conduct was the but-for cause of Mr. Zitzka's arrest on the charge of battery. Defendants have presented not only Mr. Zitzka's admission that he dragged PK and AMM by their hoodies, but also the testimony of the juveniles involved that Mr. Zitzka swung at PK and the Zitzka neighbors' testimony that they heard Mr. Zitzka threatening PK and AMM with battery and observed injuries to AMM. The fact that Mr. Zitzka was also a victim of battery that night does not alter this analysis. Because the officer defendants would have arrested Mr. Zitzka even without a retaliatory motive, plaintiffs' claim of retaliation based on the battery arrest against Mr. Zitzka "fails for lack of causal connection between

47

unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Hartman*, 547 U.S. at 260.

**3.**

Plaintiffs have met their burden of showing that a reasonable jury could find that the visit by Officers Boyer and Compton to the Zitzka home on March 10, 2005, occurred because of the Zitzkas' speech. There is evidence that these officers came to the house and threatened Mrs. Zitzka with arrest if she did not stop calling the State's Attorney's office over twenty times a day. As explained above, calls to the State's Attorney's office constitute protected speech. Lieutenant Sandford's decision to send Officers Boyer and Compton to the Zitzka home to threaten Mrs. Zitzka with arrest if she did not stop calling the State's Attorney's office – soon after the vehicle stickers critical of the WPD appeared on the Zitzka vehicles and not long before Lieutenant Sandford's email opining that only arrests will stop Mrs. Zitzka – is circumstantial evidence that the visit happened because of the Zitzkas' protected speech.

Defendants' argument that they would have done the same thing even in the absence of the protected speech – that "Boyer and Compton were simply carrying out their duties by responding to the calls to which they were dispatched" or that they "had probable cause to go to the Zitzka home and instruct her not to call the State's Attorney's office" – is a nonstarter (Defs.' Reply at 2; Boyer and Compton's Mot. for Summ. J. at 6). Threatening someone with arrest for calling the State's Attorney office is completely at odds with the First Amendment and cannot be justified as a necessary part of an officer's job, and there is no basis for the officers to believe they had probable cause to threaten to arrest Mrs. Zitzka on this basis. The fact that it was Lieutenant Sandford who dispatched Officers Boyer and Compton is circumstantial evidence that the visit to the Zitzka home

48

was motivated by retaliation for Mrs. Zitzka's protected activity (*Id.* at 17). Moreover, the State's Attorney's office ultimately determined that Mrs. Zitzka was not making the calls for which she was threatened with arrest. The officers' failure to verify the source of the calls to the State's Attorney's office before threatening arrest may be further evidence that the visit to the Zitzka home was retaliatory. Accordingly, this claim survives summary judgment.

**4.**

Similarly, plaintiffs have met their burden of showing that a reasonable jury could find that the officers conducted "drive-bys" of the Zitzka home because of the Zitzkas' speech. Sergeant Bright admitted that he occasionally ordered extra watches at the Zitzka residence, and Detectives Dale and Schlicher admitted conducting some of these watches. While the officers contend that the extra watches were done in conjunction with a particular incident or investigation or to execute a warrant, or even at the request of Mrs. Zitzka herself (*see, e.g.*, Bright Dep. at 12, 15, 23), in light of the circumstantial evidence set forth above and the possible lack of probable cause behind three of the arrest warrants, plaintiffs have presented sufficient evidence such that a reasonable jury could find that defendants conducted the drive-bys because of the Zitzkas' protected speech.

**5.**

Plaintiffs, however, have not presented sufficient evidence for a reasonable jury to find that Detective Schlicher decided not to bring rape charges against MO or charges of facilitating underage drinking against Mrs. A because of Mrs. Zitzka's speech. Although Detective Schlicher's decision not to pursue these charges occurred the week after the signs critical of the WPD went up on the Zitzkas' cars, plaintiffs cannot show that retaliation for the Zitzka speech was the but-for cause of Detective Schlicher's decision not to pursue the charges. As noted above, suspicious timing alone

rarely is sufficient to create a triable issue of material fact in support of a retaliation claim. *Moser*, 406 F.3d at 905. Here, Detective Schlicher testified that he did not pursue the charges against MO and Mrs. A because the evidence was insufficient to go forward and he doubted the credibility of Miss Zitzka's testimony. The DuPage County State's Attorney's office agreed with Detective Schlicher that there was not enough evidence to pursue charges against MO or Mrs. A. They looked into the charges at Mrs. Zitzka's request, but they declined to pursue charges themselves. On this record, a jury could not reasonably find that plaintiffs' protected speech was the but-for cause of Detective Schlicher's decision not to pursue these charges.[17]

## V.

Next, plaintiffs allege that the Village of Westmont "had an express policy to retaliate against the Zitzkas" (Pls.' Mem. at 27-28). Plaintiffs do not provide sufficient evidence of such a policy to sustain a triable issue of municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). To prove municipal liability under Section 1983, a plaintiff must present sufficient evidence to show that the constitutional violation resulted from a municipal policy, custom, or practice. *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009). "To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the village, (2) a widespread practice that is so permanent and well[-]settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking

---

[17] We also note that Detective Schlicher's decisions on November 2 and 3, 2004, preceded the date that plaintiffs filed this complaint – February 20, 2007 – by more than two years. As a result, plaintiffs' claims based on those decisions are barred by the two-year statute of limitations for Section 1983 cases. *See, e.g., United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010) (statute of limitations for Section 1983 cases in Illinois is two years).

authority." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (internal quotations omitted).

Plaintiffs argue that they have shown an express and widespread Village policy to retaliate against the Zitzkas, as well as a person with final policymaking authority – Chief Sticha – who carried out a policy of retaliation against the Zitzkas. An "express policy" requires "evidence that there is a true municipal policy at issue, not a random event." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006). Plaintiffs contend that Chief Sticha's notes titled the "Zitzka caper," and Lieutenant Sandford's email suggesting that only arresting Mrs. Zitzka will "stop her," demonstrate that the Village of Westmont had an express policy to retaliate against Mrs. Zitzka. While the meeting and email – together with the timing of certain events – may be circumstantial evidence of retaliation against the Zitzkas, they are far from evidence of an express policy to retaliate against the Zitzkas.

Next, plaintiffs contend that Chief Sticha had a policy of retaliating against the Zitzkas and that, as a final policymaking authority regarding the "investigatory and arrest decisions" of the WPD, carried out the Village policy of retaliating against the Zitzkas (Pls.' Mem. at 25). This argument fails because plaintiffs cannot show that Chief Sticha was a final policymaker for the Village of Westmont. The determination of whether the Westmont Chief of Police is a final policymaker under Section 1983 is a question of state or local law. *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004). An official's authority is considered final "in the special sense that there is no higher authority." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). Accordingly, the Chief of Police will not be considered a "final policymaker[] for the purposes of Section 1983 [if his] actions are constrained by rules and policies of a higher power." *Kasak v. Vill.*

51

*of Bedford Park*, 563 F. Supp. 2d 864, 881 (N.D. Ill. 2008). "Authority to make a final decision need not imply authority to establish rules." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). Although the Westmont Chief of Police "may make such rules and regulations for the guidance of the members of the police department as he shall see fit," these rules are only binding on members of the police department when approved by the Village President and Board of Trustees. *See* Westmont Ord. # 01-08 (Article II 54-60). Accordingly, any rule or regulation promulgated by the Chief of Police is "constrained by rules and policies of a higher power," *Kasak*, 563 F. Supp. 2d at 881; in this case, the Westmont Village President and Board of Trustees.

Furthermore, "to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy." *Auriemma*, 957 F.2d at 400. Here, the Village of Westmont has an ordinance explicitly requiring that "every member of the police department . . . conduct himself in a proper and law-abiding manner" (Pls.' Ex. BN: Vill. Ord. # 01-08 (Article II 54-34)). The Chief of Police, as a member of the WPD, has no authority to institute an unconstitutional, and therefore illegal, policy or practice. Therefore, if in the course of his duties, the Chief of Police, or his subordinates, participated in practices that violated Ms. Zitzka's constitutional rights, those practices violated rather than implemented a Village of Westmont policy. *See Auriemma*, 957 F.2d at 401 (Chicago police superintendent had no power to countermand the statutes regulating the operation of the department).

In addition, plaintiffs have not met their burden of demonstrating a genuine issue of material fact that there is a widespread practice that is so permanent and well-settled as to constitute a custom or usage with the force of law. The Seventh Circuit has held that "[g]enerally speaking, . . . a plaintiff should not be foreclosed from pursuing Section 1983 claims where she can demonstrate that

52

repeated actions directed at her [one person] truly evince the existence of a policy." *Phelan*, 463 F.3d at 789-90; *see also Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (noting "that it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience"). Nevertheless, "the word 'widespread' must be taken seriously." *Phelan*, 463 F.3d at 791. "[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a municipal policy at issue, not a random event." *Grieveson*, 538 F.3d at 774. In *Phelan*, the Court affirmed the district court's grant of summary judgment on the plaintiff's policy claim where the plaintiff presented evidence that multiple Cook County employees subjected her to harassment and discrimination because she failed to weave the separate incidents into a cognizable, "permanent and well-settled" policy. *Phelan*, 463 F.3d at 791. Likewise, in *Grieveson*, the Seventh Circuit held that the plaintiff's evidence of "four incidents that he alone experienced fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law." *Grieveson*, 538 F.3d at 774-75.

To survive summary judgment, plaintiffs must "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Valentino*, 575 F.3d at 675. Municipal liability based on a facially lawful municipal action may also be established if the plaintiff demonstrates that the municipal action was taken with "deliberate indifference as to its known or obvious consequences." *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 406-07 (1997). In order to show deliberate indifference, it must be clear that the Village of Westmont's policymakers "were aware of a substantial risk of a constitutional violation and failed to take appropriate steps to protect

53

plaintiffs from a known danger." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (internal citations and quotations omitted). If plaintiffs demonstrate that "the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Valentino*, 575 F.3d at 675 (citing *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)).

As in *Grieveson* and *Phelan*, the incidents that the Zitzkas allegedly experienced during the approximately seven-month time frame, do not meet the test of a widespread unconstitutional practice that is so well-settled that it constitutes a custom or usage with the force of law. Ms. Zitzka offers no evidence suggesting that the Village of Westmont, its President or Board of Trustees, had any knowledge of her arrests by WPD officers. While they may have been aware of Mrs. Zitzka's complaints about the WPD from her speech to the Committee as a Whole and her vehicle signs, the alleged retaliatory acts against the Zitzkas cannot be said to have arisen so many times or on such a public level that the Village must have known or acquiesced in the outcome. Therefore, the Village of Westmont cannot be held liable under *Monell*, and the Village's motion for summary judgment is granted.

## VI.

We now turn to plaintiffs' state law claims. In Count IX of their complaint, plaintiffs allege malicious prosecution under Illinois law based on the five criminal prosecutions the WPD initiated against Mr. and Mrs. Zitzka (Compl. ¶ 144). In order to establish a claim of malicious prosecution under Illinois law, the plaintiff must show "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice;

54

and (5) damages resulting to the plaintiff." *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). The existence of probable cause is a complete defense to a malicious prosecution suit. *Johnson*, 575 F.3d at 659.

Here, as set forth above, plaintiffs have presented a genuine issue of material fact as to whether defendants had probable cause to arrest Mr. and Mrs. Zitzka on three of the five charges against them: the telephone harassment, disorderly conduct, and criminal trespass charges. Because the police had probable cause to bring the remaining two charges against them, plaintiffs' malicious prosecution claim cannot stand as to those charges.

As to the disorderly conduct charge, defendants argue that plaintiffs' malicious prosecution claim is time-barred by the Illinois Local Governmental and Governmental Employee Tort Immunity Act ("ITIA"), which sets forth a one-year statute of limitations for claims against a local entity or its employees, including claims of malicious prosecution. 745 ILCS § 10/8-101(a). "A cause of action for malicious prosecution does not begin to accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor." *Ferguson v. City of Chicago*, 80 N.E.2d 455, 459 (Ill. 2004). Here, the criminal proceeding against Mrs. Zitzka for disorderly conduct was terminated on September 7, 2005, when the court entered a finding of not guilty in her favor (DSOF ¶ 139). Plaintiffs' complaint in this case, however, was not filed until February 20, 2007, more than one year after this date. Thus, plaintiffs' malicious prosecution claim based on the disorderly conduct prosecution is time-barred.

The malicious prosecution claim as to the telephone harassment and criminal trespass to land charges, however, are not time-barred because those cases were not terminated until July 23, 2007, when they were dismissed *nolle prosequi*, for want of prosecution, on the prosecutor's motion.

Those cases were set for trial that day, but none of the O family showed up in court to testify on the matters. The prosecutor made an oral motion for a continuance, but the court denied the motion. Thus, the Assistant State's Attorney moved to *nolle prosequi* the cases. Despite Mrs. Zitzka's attorney's demand for a trial, the judge granted the prosecutor's motion.

Defendants contend that plaintiffs cannot prove malicious prosecution here because a dismissal *nolle prosequi* does not constitute a "termination of the proceeding in favor of the plaintiff." *Johnson*, 575 F.3d at 659. The Illinois Supreme Court has adopted the majority rule that "a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242-43 (Ill. 1996). The Court explained that the abandonment of proceedings is "not indicative of innocence" when "the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." *Id.* at 1243. The Court further stated that "[t]he circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Id.* The plaintiff has the burden to show that the *nolle prosequi* was "entered for reasons consistent with his innocence." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001).

The Seventh Circuit recently weighed in on the issue, describing the above formulation of the indicative of innocence test for proceedings terminated *nolle prosequi* as "ambiguous." *Deng v. Sears, Roebuck and Co.*, 552 F.3d 574, 576 (7th Cir. 2009). In *Deng*, the Court ruled that whether

"the dismissal of charges when a witness does not appear at a preliminary hearing must be treated as a resolution favorable to the accused. . . . is an open question in Illinois. *Id.* Concerned with opening the door to subjecting criminal prosecutors to an "inquisition" as to the reasons for their exercise of prosecutorial discretion, in *Deng*, the Seventh Circuit skipped the second prong of the *Swick* malicious prosecution test, and proceeded to the probable cause question. *Id.* at 577.

Indeed, whether the *nolle prosequi* based on the absence of the witnesses for the prosecution was indicative of Mrs. Zitzka's innocence or the result of the "impracticability" of bringing her to trial that day is a difficult question. In light of *Deng* and the ambiguity involved in this question, we find that at a minimum, plaintiffs have presented a genuine issue of material fact that the *nolle prosequi* in Mrs. Zitzka's cases were entered for reasons indicative of her innocence, and we proceed to the next step in the malicious prosecution test. Here, we have already determined that plaintiffs have succeeded in presenting a genuine issue of material fact that Detective Schlicher did not have probable cause to arrest Mrs. Zitzka on the telephone harassment or criminal trespass to land charges. Thus, we proceed to the fourth prong of the malicious prosecution test in Illinois – the question of whether plaintiffs have presented sufficient evidence to show the presence of malice.

"Malice, as an element of malicious prosecution, is proved by showing that the prosecutor was actuated by improper motives." *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000). In this case, the arresting officers are the defendants, and thus, the question becomes – similar to the Fourth Amendment false arrest question – whether "the officers committed some [further] improper act after they arrested him without probable cause, for example, that they pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up exculpatory evidence." *McDade v. Stacker*, 106 Fed. Appx. 471,

57

475 (7th Cir. Jul. 14, 2004) (quoting *Snodderly*, 239 F.3d at 901). "Although a lack of probable cause does not itself establish malice, the trier of fact may infer malice from lack of probable cause if there is no credible evidence which refutes that inference." *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 270 (Ill. App. Ct. 2002).

As explained above, plaintiffs have presented a genuine issue of material fact that Detective Schlicher covered up exculpatory evidence by not bringing the results of the telephone trace or the conflicting testimony and motives in the criminal trespass case to the attention of the prosecutor. Consequently, a reasonable jury could find that the prosecutor had pursued the telephone harassment and criminal trespass cases because Detective Schlicher withheld that information from the prosecutor.

As for damages, the last prong of the malicious prosecution test, plaintiffs must show that they "suffered a special injury beyond the usual expense, time or annoyance in defending the underlying action." *Howard v. Firmand*, 880 N.E.2d 1139, 1142 (Ill. App. Ct. 2007). Here, plaintiffs have presented sufficient evidence to support their allegations of special injuries beyond the usual time and expense in defending the underlying action because of Mrs. Zitzka's criminal prosecutions: that the Zitzkas were deterred from further First Amendment activity, Mrs. Zitzka lost her job with Ms. Goetschel, the Zitzkas were essentially forced to relocate to Indiana, and Mrs. Zitzka experienced certain emotional difficulties (PAF ¶¶ 76-80). Thus, a reasonable jury could find for plaintiffs on their malicious prosecution claim based on Mrs. Zitzka's prosecutions for telephone harassment and criminal trespass to land.

## VII.

Defendants seek summary judgment on plaintiffs' state law claim for intentional infliction of emotional distress ("IIED"). Under Illinois law, "[t]o survive summary judgment on the . . . claim for intentional infliction of emotional distress, plaintiffs must present evidence showing that (1) the defendant's conduct was truly extreme and outrageous, (2) the defendant either intended to inflict emotional distress or knew there was at least a high probability that he would cause severe emotional distress, and (3) the conduct in fact caused severe emotional distress." *Stokes*, 599 F.3d at 626 (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)).

Initially, defendants argue that the IIED claim is barred by the ITIA's one-year statute of limitations because their alleged conduct occurred more than one year before plaintiffs filed this suit on February 20, 2007. In Count VII, plaintiffs assert an IIED claim based generally upon the conduct alleged in paragraphs one through seventy-six of the complaint as the basis for plaintiffs' other claims (Compl., ¶ 132). In the opinion on defendants' motion to dismiss, we determined that only two of those alleged incidents and their resulting injuries occurred within one year of plaintiffs filing suit. In the first incident, plaintiffs allege that on May 3, 2006, an officer drove by the Zitzka home slowly and glared, and in the second incident, plaintiffs allege that on May 13, 2006, two police cars were parked in proximity to the Zitzka home. *Zitzka v. Vill. of Westmont*, No. 07-949, 2007 WL 3334336, at *9 (N.D. Ill. Nov. 6, 2007). Furthermore, plaintiffs allege that they suffered an injury from defendants' actions as late as May 31, 2006, because they attribute their move out of Westmont to defendants' alleged actions.

In that opinion, we declined to grant defendants' motion to dismiss the remainder of the Zitzkas' IIED claims as time-barred, because IIED may constitute a "continuing tort" in Illinois. *See*

*Zitzka*, 2007 WL 3334336, at \*9 (citing *Feltmeier*, 798 N.E.2d at 88-89). "A continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation," unless the tort at issue involves a continuing or repeated injury. *Feltmeier*, 798 N.E.2d at 85. Where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease. *Id.* at 89. The doctrine of continuing violation in Illinois "does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes." *Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006). Illinois does not apply the continuing violation rule to "a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 435 (7th Cir. 2009).

Here, the actions plaintiffs allege constitute IIED consisted of a series of discrete acts, such that the acts occurring before February 20, 2006, are not actionable under the ITIA. In a recent case, for example, the Seventh Circuit held that the continuing tort rule did not apply to the plaintiff's IIED claim, because the adverse action on which the claim was based – the filing of an indictment against the plaintiff – was a discrete, actionable act. *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009). Contrary to the plaintiff's arguments, the Seventh Circuit held that the entire prosecution following the indictment constituted "subsequent damages" which flowed from the indictment, not a continuing tort. *Id.* Therefore, the Court held that the plaintiff's state law IIED claims were time-barred. *Id.*

Furthermore, the injury plaintiffs claim that they suffered in May 2006 because of the alleged earlier retaliatory acts – their move out of Westmont – is not part of a "continuing or repeated injury"

such that it would toll the statute of limitations on all the actions plaintiffs allege make up their IIED claim. *Feltmeier*, 798 N.E.2d at 85. Rather, plaintiffs' alleged "forced" move out of Westmont is part of the alleged "continual ill effects" felt from the alleged earlier adverse acts. *Id.* Therefore, outside of the few isolated incidents in May 2006, defendants' alleged adverse conduct, viewed as a whole, ended outside of the one year statute of limitations period, and plaintiffs' IIED claims based on acts that preceded February 20, 2006, are time-barred.

The only two timely alleged incidents, from May 2006, cannot sustain a claim for IIED. To be "truly extreme and outrageous," a defendant's conduct must be "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Stokes*, 599 F.3d at 626. IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 983 (7th Cir. 2008) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). The two incidents from May 2006 – involving two "extra watches" or "drive-bys" of plaintiffs' house – were not truly extreme and outrageous. In fact, even combined with the earlier, untimely alleged drive-bys and extra watches of plaintiffs' house, this would not constitute extreme and outrageous conduct under Illinois law. Courts have found that much more severe actions do not constitute truly extreme and outrageous conduct under Illinois law *See Schiller v. Mitchell*, 828 N.E.2d 323, 334 (Ill. App. Ct. 2005) (holding that continuous video surveillance of the plaintiffs' house, does not constitute extreme and outrageous conduct); *see also Breneisen*, 512 F.3d at 983 (affirming summary judgment on IIED claims because none of the conduct complained of by the plaintiffs, which included being demoted, questioned or criticized upon return from FMLA leave, passed over for raises or given reduced raises, denied tuition reimbursements, or given unexcused absences met this demanding standard);

61

*Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942-43 (Ill. App. Ct. 1997) (holding that because the defendant thought the plaintiff had committed a crime, defendant's conduct in contacting the police – who then took the plaintiff into custody – did not constitute extreme and outrageous conduct). Therefore, defendants' motions for summary judgment as to plaintiffs' IIED claims are granted.

# VIII.

We now turn to plaintiffs' motion to amend their complaint for a second time (doc. # 140) – a motion they filed long after the close of discovery, and after they filed their response to the summary judgment motions. In the motion, plaintiffs propose to add factual allegations regarding the resolution of the prosecutions against the Zitzkas which occurred subsequent to the filing of the original complaint, as well as a substantive count for civil conspiracy (Mot. to Amend at 2). Initially, we find that amendment is unnecessary based on the resolution of the criminal prosecutions, because these assertions already are part of the record through the parties' statements of facts and supporting exhibits.

As for the request to add a civil conspiracy count, under Federal Rule of Civil Procedure 15(a), "[d]istrict courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009)(quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)). Plaintiffs' motion to amend came one and a half months after they filed their response to defendants' motions for summary judgment, and more than three years after plaintiffs began this litigation. Plaintiffs claim that this extraordinary delay is justified because it did not become "apparent" to them that the "facts adduced

in discovery" would support such a claim until the summary judgment briefing was almost completed (Mot. to Amend. Reply at 5). We find that explanation untenable. The proposed amendment adds no new factual allegations uncovered in discovery to support a conspiracy claim. The new count simply alleges that "defendants, chief of police and other WPD officials together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely arrest and imprison and to intentionally inflict severe emotional distress on plaintiffs" (doc. # 140, Ex. A ¶ 116). Plaintiffs do not explain what they learned through the summary judgment briefing that only recently alerted them to a conspiracy claim.

Indeed, plaintiffs make other arguments that suggest they should have been aware of a conspiracy claim years ago. For example, plaintiffs argue that such a claim was foreshadowed by this Court's ruling on the motion to dismiss three years ago. In short, we find unpersuasive plaintiffs' explanation for the lateness of their motion to amend.[18]

Furthermore, plaintiffs' motion to further amend their complaint to add a count for civil conspiracy is futile, because it fails to allege an additional, essential element of a civil conspiracy claim: an agreement. A conspiracy requires proof of "an agreement to accomplish either an unlawful purpose or a lawful purpose by unlawful means." *Mosely v. City of Chicago*, – F.3d –, 2010 WL 2943907, at *7 (7th Cir. July 29, 2010). Even before *Bell Atlantic*, conspiracy allegations were held to a higher standard than other allegations. *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th

---

[18]In addition, plaintiffs claim that they only "recently became aware" of a case before a different judge in this district – with a docket number from 2004 – which allegedly had similar facts and a claim for civil conspiracy. This argument is a non-starter. Plaintiffs have not submitted any evidence of this other case that could persuade us not only that plaintiffs were justified in not becoming aware of that case until recently, but that the case is at all persuasive or probative here.

Cir. 2009). The existence of the "Zitzka caper" memorandum does not meet this higher standard of alleging an agreement.

"There must be a point at which a plaintiff makes a commitment to the theory of its case," and that point is not three years into the litigation. *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 774 (7th Cir. 1995) (quoting *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993)). We deny plaintiffs' motion to amend their complaint (doc. # 140).

## CONCLUSION

For the foregoing reasons, we (1) grant the Village's motion for summary judgment (doc. # 122); (2) grant in part and deny in part Officer Boyer's and Officer Compton's motion for summary judgment (doc. # 119); (3) grant in part and deny in part Detective Dale's motion for summary judgment (doc. # 121); (4) grant in part and deny in part Detective Schlicher's motion for summary judgment (doc. # 117); and (5) grant in part and deny in part Sergeant Bright's and Officer Newton's motion for summary judgment (doc. # 120). In addition, as explained above, we deny defendants' motions to strike (docs. ## 142, 143, 144) as moot, and we deny plaintiffs' motion to file an amended complaint (doc. # 140).

The partial grants of summary judgment have left the following claims for trial. *First*, none of the IIED claims survive. *Second*, the claims alleged on behalf of the minor Zitzka children – First Amendment retaliation and IIED - do not survive summary judgment. *Third*, Mr. Zitzka's claims based on his arrest for battery do not survive summary judgment. *Fourth*, all of Mrs. Zitzka's Fourth Amendment claims – except for the claim based on her arrest for criminal defacement of property and her claim that Officer Newton violated the Fourth Amendment when he arrested her on the telephone harassment charge – survive summary judgment. *Fifth*, all of Mrs. Zitzka's First

Amendment retaliation claims survive. *Fifth*, Mrs. Zitzka's malicious prosecution claims survive only as to the telephone harassment and criminal trespass to land charges.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: September 28, 2010**